## WALSER v. INTERNATIONAL UNION BANK.

### In re COHN.

Circuit Court of Appeals, Second Circuit.
August 8, 1927.

No. 375.

1. Bankruptcy ⚖159—Where bankrupt received bank's money through transaction with assistant cashier which he knew was unauthorized, he became bank's "debtor," within Bankruptcy Act. (11 USCA § 1 et seq.).

Where bankrupt, who knew he was on the eve of bankruptcy, received bank's money from its assistant cashier through a transaction which he knew was unauthorized, and which amounted to a misappropriation of the money, he became the bank's "debtor," within the meaning of the Bankruptcy Act (11 USCA § 1 et seq.).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debtor.]

**2. Bankruptcy ⬤══303(4)—Evidence held to show that bank officials knew money received from assistant cashier to reimburse bank for misappropriation for bankrupt's benefit was obtained from bankrupt.**

Evidence *held* to show that bank officials, when they received a certain payment in money from their assistant cashier to reimburse the bank for a misappropriation by the cashier for the benefit of his friend on the eve of bankruptcy, knew that a large portion of the money had been obtained from the friend, and also that the friend was in financial difficulties.

**3. Bankruptcy ⬤══166(3)—Where bank knew, when receiving bankrupt's money, that he was in financial difficulties, transaction was voidable preference.**

Where bank knew, when receiving money from its assistant cashier, that it had been obtained from the assistant cashier's friend, who shortly thereafter became bankrupt, and that he was then in financial difficulties, the transaction was a voidable preference.

**4. Bankruptcy ⬤══164—Money obtained from bankrupt held "preference," notwithstanding it was to reimburse bank for money misappropriated for bankrupt's benefit.**

Money obtained from bankrupt shortly before his bankruptcy held a "preference," notwithstanding it was to reimburse the bank for money misappropriated by its cashier for the bankrupt's benefit, since the money misappropriated was not traced to the money received from the bankrupt by the bank.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Preference.]

Appeal from the District Court of the United States for the Southern District of New York.

Bill by Kenneth E. Walser, as trustee in bankruptcy of Harry A. Cohn, bankrupt, against the International Union Bank, to recover as voidable preferences payments of $23,725 made to defendant. Decree of dismissal on the merits (18 F.[2d] 957), and complainant appeals. Reversed and remanded, with directions.

Greenbaum, Wolff & Ernst, of New York City (Edward S. Greenbaum and Jonas J. Shapiro, both of New York City, of counsel), for appellant.

Morris Hillquit, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge. The elements of a preference are proved conclusively, and the only question is whether the bank had such knowledge as to make the preference voidable under section 60b of the Bankruptcy Act (11 USCA § 96 [Comp. St. § 9644]). For a decision of this question, it is necessary to review the facts in some detail.

The bankrupt, Harry A. Cohn, was a public accountant, and also engaged in the jewelry business. During 1924 Cohn opened two accounts with the defendant bank, one in his own name, and one in the name of Atlas Audit Corporation, of which he was president. These accounts were small and unsatisfactory, and after two or three months were closed out by order of the bank's officers, Messrs. Rodriguez and Kaplowitz. Mr. Rodriguez was the vice president and general manager. Mr. Kaplowitz was the cashier. Henry Wollenweber was the assistant cashier, and as such he supervised the accounting department of the bank and the work of its receiving and paying tellers. During 1925 Cohn and Wollenweber became friendly, and the latter permitted Cohn to open accounts with the bank, using fictitious names in order to conceal the fact from the bank's officers, and to use the accounts to "kite" checks; that is, Wollenweber permitted checks to be drawn on these accounts against uncollected deposits and to be paid out of the bank's money. One of these accounts was in the name of S. M. Barnett, an alias adopted by Cohn's employee, Mandel, and between September 19 and October 3, 1925, Wollenweber, in the manner above described, paid to Cohn out of the bank's moneys sums aggregating $55,000. Such payments were made in amounts ranging from $1,000 to $10,000, on checks signed by Barnett and drawn to the order of Vollman & Co. There was never enough balance in the Barnett account to cover a single one of such checks, but in all cases Wollenweber paid the checks, or ordered them paid by the paying teller, and such payments were subsequently covered by Cohn, either by a deposit of cash, or of checks which were carried as cash by the teller. No entry was made on the books of the bank of any of these transactions. Wollenweber admitted receiving bribes of cash and jewelry from Cohn in return for these accommodations.

The suspicions of Wollenweber's superior officers that he was committing irregularities were first aroused on October 5, 1925, when Mr. Rodriguez received a telephone call from the Irving Bank-Columbia Trust Company requesting him to redeem a certain check drawn upon the trust company and by mistake paid by it, although the drawer's account was insufficient. The check was drawn to the order of Harry A. Cohn, was indorsed by him, and had come through the defendant bank. Rodriguez found that no account in the name of Cohn was carried on

the books of the bank. The trust company also inquired about the S. M. Barnett account, and Rodriguez ascertained from the books that there was a small account in this name. He then called in Wollenweber, and was told by him that he had cashed the check in question to accommodate his friend .Cohn, after telephoning the trust company and being informed by it that the check was good. With respect to the Barnett account, Rodriguez says that Wollenweber said that "he had allowed them to make deposits to cover checks which had come in through the Federal Reserve Bank exchange."

The next morning, Kaplowitz, who also talked with Wollenweber on October 5 about the trust company check, went early to the bank in order to examine the exchanges before Wollenweber's arrival. His examination disclosed three checks, aggregating $23,725. One of these was a check for $10,000, payable to the order of Harry A. Cohn, drawn by a man named Rabinowitz, and returned that morning through the Federal Reserve Bank for lack of funds. The other two checks, one for $13,410,. the other for $315, were being carried as cash by one of the paying tellers pursuant to Wollenweber's instruction. The two last-mentioned checks had not been presented for payment to the banks on which they were respectively drawn, because Cohn had promised Wollenweber to make them good on October 5. None of the three checks were credited to the account of any depositor.

Upon being confronted with these three checks, Wollenweber says he admitted to Kaplowitz and Rodriguez that the checks had been delivered to him by an employee of Cohn, and that he had cashed them before collection, and had instructed the paying teller to carry them as cash items. It was, as the defendant contends, 'a misappropriation of the bank's money by Wollenweber, who turned the same over to Cohn on Cohn's promise to repay the amount before the misappropriation was discovered.

[1] This made Cohn the bank's debtor in the sum of $23,725. He received the bank's money, knowing that Wollenweber had no authority to deal with it in this manner. In other words, he converted the bank's money, and became its debtor, within the meaning of the Bankruptcy Act (11 USCA § 1 et seq. [Comp. St. §§ 9585–9656]). See Crawford v. Burke, 195 U. S. 176, 25 S. Ct. 9, 49 L. Ed. 147; Burgoyne v. McKillip, 182 F. 452 (C. C. A. 8). That the transaction was not entered upon the books of the bank, or that its officers did not know to whom Wollenweber

had paid the money—if such be the fact, which will be discussed hereafter—is immaterial on the issue of his indebtedness to the bank.

Upon discovery of Wollenweber's misappropriation of the money paid out on these three checks, the officers demanded that he immediately make restitution. On the same day, October 6, 1925, he paid the bank $15,-000 in cash in the morning, $8,000 in cash later in the day, and $725 by a withdrawal order on his personal savings deposit in the bank. Of the cash so paid, $19,500 was obtained by Wollenweber from Cohn; $3,500 in cash and the withdrawal deposit of $725 was Wollenweber's own money.

[2, 3] The petition in bankruptcy was filed against Cohn two days later, October 8, 1925. He testified that he was hopelessly insolvent on October 6, when his $19,500 was paid to Wollenweber, and it was stipulated in the case that the trustee in bankruptcy would be able to pay only a small dividend to creditors. Consequently the sole disputed question on the issue of a voidable preference is whether the bank officials knew that the money came from Cohn, and that he was in financial difficulties. This is the issue upon which the case turns.

There is no dispute that Wollenweber knew of Cohn's insolvency. He met Cohn on the evening of October 5, apparently following his interview with Rodriguez, and told Cohn he would have to take care of the overdrafts amounting to $23,725. Cohn replied that he was on the eve of bankruptcy, but that he would sell jewelry enough to make good the account and protect the bank. Wollenweber says that, when he turned the cash over to Rodriguez on October 6, he told him that he had obtained it from Cohn's employee, Arnow, who had disposed of jewelry to raise it, and that Cohn was in financial difficulties and had fled to Newark. If this is believed, there is no doubt that the bank had such knowledge as to make its receipt of the money a voidable preference. The amount of the preference, however, would be only $19,500. What Wollenweber paid out of his own pocket was not a preference.

Rodriguez denies this conversation with Wollenweber. He denies that he knew the money came from Cohn. He says that Cohn was mentioned to him only on October 5 in connection with the check about which the Irving Bank-Columbia Trust Company had telephoned, and that all Wollenweber said was that Cohn was a friend of his. He says that, when the three checks in question were discovered on the morning of October 6, he

did not in any way connect them with Cohn; that he asked Wollenweber why he had cashed them, and was told he did it to accommodate a friend; that the name of Cohn was not mentioned, either in that conversation or when the money was paid over later in the day. He says, further, that he told Wollenweber most emphatically that he must get the money that day; but he was not interested in where Wollenweber would get it, and he did not ask who was the friend whom Wollenweber had accommodated.

This story of the interview with Wollenweber upon discovery of the checks taxes credulity. It is incredible that, when the bank officers find their employee favoring a friend with the bank's money, they should make no inquiry as to who the friend was, and whether he could make good. Wollenweber, getting only $3,500 or $4,000 a year salary, could scarcely be expected to have $23,725 that he could lay his hands on instantly. When Rodriguez testifies that he did not ask who had received the accommodation, and that he was not interested in where the money to repay it was to come from, he belies human nature. He admits that he learned on October 5 that Cohn was the friend for whom Wollenweber had cashed the trust company check. No reason appears why Rodriguez should not have gotten similar information regarding the other three checks discovered on the 6th. His story that he was satisfied with Wollenweber's statement that he had been "a damn fool" to assist a friend, and questioned him no further, is unbelievable. His statement that he did not connect Cohn with the three checks in question is contradicted by the very terms of one of the checks, for the $10,000 check returned by the Federal Reserve Bank was drawn by Rabinowitz to the order of Harry A. Cohn. It is not believable that, when Rodriguez inquired about the S. M. Barnett account on October 5, he learned merely that it was a small account. Wollenweber's story that he then told Rodriguez who Barnett was is far more likely.

The subsequent conduct of Rodriguez in respect to this transaction is not such as to inspire trust in his veracity. He admittedly lied to Assistant District Attorney Pecora when questioned about Wollenweber's irregularities regarding these checks. He denied that he had learned of such irregularities on October 5 or 6, 1925, or that the bank had ever received any money from Wollenweber to make good the overdrafts of $23,725. When confronted by Wollenweber, who had already told the facts to Mr. Pecora, Rodriguez persisted in his denial. A few days lat-

er, after consulting his attorney, he wrote Mr. Pecora a letter, admitting his denials were false, and offering as an excuse that he had promised Wollenweber not to disclose his irregularities, except to the directors of the bank. This excuse, lame at best, collapses completely when it is remembered that the second denial was in Wollenweber's presence, and after Wollenweber had himself admitted the truth to Mr. Pecora in the presence of Rodriguez. Rodriguez also lied to Mr. Galinson, the accountant of the trustee in bankruptcy, if Wollenweber's testimony is to be believed. No effort was made to contradict it. Wollenweber says that, when Galinson called at the bank, Rodriguez told him the bank had not received the money. Wollenweber also says that Rodriguez told him to keep quiet about the payment lest the creditors should be able to get it. Rodriguez was not questioned about this conversation.

Kaplowitz tells much the same story as Rodriguez as to the interview with Wollenweber on October 6. On direct examination he says he did not know that Cohn was involved in the $23,725 represented by the checks. On cross-examination, however, when confronted with his testimony in the bankruptcy proceedings, he admitted that Wollenweber had told him on October 5, when the check returned by the Irving Bank-Columbia Trust Company was under discussion, that another $10,000 check relating to Cohn would come in the next day, so that he identified the $10,000 check returned by the Federal Reserve Bank on the 6th as the additional Cohn check referred to by Wollenweber in the previous conversation. He denies asking Wollenweber where he was going to get the money, but admits testifying in the bankruptcy proceedings as follows:

"Q. Didn't you know where he was going to get that money from? A. Well, I thought he either had the money himself, or he would get it from the people to whom he cashed those checks; either Cohn or his accomplices, whoever they might have been."

Kaplowitz was not present when Wollenweber paid over the money to Rodriguez. Consequently what was said at that time respecting the source of the money and Cohn's financial condition depends entirely upon the testimony of these two. There is a flat conflict between them. Wollenweber has no interest to serve in favoring the trustee, rather than the bank. Rodriguez, as an officer of the bank, has an interest. I cannot credit his story that he made no inquiry as to whom Wollenweber had accommodated and did not connect the checks with Cohn. His protested

indifference where the money to repay the overdrafts was to come from, and his repeated denials that the bank was paid by any one, are only consistent, to my mind, with a consciousness that the bank's title was subject to attack. Had he really thought the money was Wollenweber's, and that he was making good his own defalcation, there would have been no reason to hesitate to admit the receipt of the money. We think there is sufficient evidence that the bank had knowledge that it was receiving a preference, and that the dismissal of the complaint was error.

Placing the decision, as we do, upon a question of fact, renders it unnecessary to pass upon the interesting question of law urged by the appellant, namely, that, because the bank accepted the benefit of Wollenweber's acts in its behalf in getting the money, it is chargeable with his knowledge that receipt of the money would effect a preference.

[4] The fallacy of defendant's contention that, because its money was in effect stolen, the repayment of a like amount could not effect a preference requires no exposition. No effort was made to trace the bank's money into the jewelry sold to raise the sum repaid to the bank. See Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873.

The decree is reversed, with costs, and the cause remanded, with directions to enter a decree for the complainant for the sum of $19,500 and interest from the date of suit. See Kaufman v. Tredway, 195 U. S. 271, 25 S. Ct. 33, 49 L. Ed. 190.