**UNITED STATES of America, Appellee,**

v.

**Roger BURNETT, Defendant–Appellant.**

**No. 364, Docket 92–1167.**

United States Court of Appeals,
Second Circuit.

Submitted Dec. 18, 1992.

Decided March 22, 1993.

---

Denise E. O'Donnell, Asst. U.S. Atty., W.D.N.Y., Buffalo, NY (Gretchen L. Wylegala, Asst. U.S. Atty., Dennis C. Vacco, U.S. Atty., W.D.N.Y., Buffalo, NY, of counsel), for appellee.

John J. Molloy, West Seneca, NY, for defendant-appellant.

Before CARDAMONE, PIERCE and ALTIMARI, Circuit Judges.

CARDAMONE, Circuit Judge:

Recognizing that all defendants are entitled to help at every stage of a criminal proceeding and that a lawyer, like a laborer, is worthy of hire, the Criminal Justice

Act of 1964, 18 U.S.C. § 3006A (1988), provides for assignment of and payment to a lawyer representing an indigent defendant. This appeal presents a recurring problem of what the consequences should be when a lawyer files an inadequate *Anders* brief.[1]

John J. Molloy, Esq. was trial counsel for defendant Roger Burnett during his trial on criminal charges in the United States District Court for the Western District of New York (Arcara, J.). Following Burnett's conviction, attorney Molloy continued as his appellate counsel under the Criminal Justice Act and now seeks to be relieved pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). The appellee, United States of America, has moved for summary affirmance.

## I

### A. *Facts*

On November 15, 1991 a jury convicted Burnett of bank fraud committed in violation of 18 U.S.C. §§ 1344(1) and (2) (Supp. 1991). The government alleged that Burnett was the principal person responsible for a check kiting scheme involving five accounts in four different banks.

By check kiting a person can mislead a bank into thinking that an account balance is higher than it actually is. A prerequisite to this type of criminal activity is to deal with banks whose policy is to credit a deposit when made, rather than crediting a check when it clears through the bank on which it is drawn. A person kiting checks revolves the same money through two or more accounts by, for example, depositing a check drawn on bank A into bank B, then depositing a check drawn on bank B into bank A to cover the originally deposited check. Timing is of the essence to prevent checks from being returned for insufficient funds. The purpose of such an illegal scheme is to keep artificially high balances in more than one account so that "legitimate" checks (to entities other than the principal) can be drawn on accounts that actually have negative balances, while preventing the banks from discovering that these accounts are overdrawn.

Appellant began as a legitimate businessman. He organized Rotec, Inc. in November 1987 to manufacture and sell small trailers. To purchase supplies for Rotec, in 1988 he visited Arcade Hymatic Co., a business organized to manufacture and sell devices that clean dairy barn manure chutes. Arcade Hymatic was owned by Donald Stefan and his mother, Effie. The Stefans were anxious to sell their business and quickly agreed to sell to Burnett on condition that he would undertake to build up the business. Effie Stefan thereafter gave appellant the company checkbook, and Donald Stefan signed many blank checks so that Burnett could run Arcade Hymatic.

When Rotec suffered a fire in the fall of 1988, it lost much of its inventory. Burnett began to lose money and overdrew the Arcade Hymatic, Rotec and his two personal checking accounts. He then began kiting checks between these accounts to cover expenses for the two businesses. He also asked one of his business partners, Gary Miller, to let him use Miller's personal checking account to deflect possible suspicion raised by the many checks made out to Burnett, or to the two companies, and signed by him. Burnett testified that he kept sloppy books, did not know at any one time how much money was in any individual account, and was only trying to keep his businesses afloat.

The check kiting scheme continued during November and December 1988 and early January 1989, at which time Nancy Barney, an officer at the Cattaraugus County Bank, noticed suspicious activity in Burnett's personal checking account. She froze the account, permitting deposits to be made but paying no checks drawn on the account. Ms. Barney testified that the common practice of a bank suspecting check kiting is to cover itself for losses; she therefore did not notify the other banking institutions until she was sure her bank was covered. Eventually the other banks

---

**1.** Because this opinion concerns, in part, an administrative matter, the opinion has been circulated to all of the active judges of this Court prior to filing.

also noticed suspicious activity and froze the Miller and Arcade Hymatics accounts. The last institution to discover the scheme was the Alco Federal Credit Union, which maintained the Rotec account.

When the dust settled, Alco Federal Credit had suffered a loss of approximately $23,000. Defense attorney Molloy maintained throughout the trial that his client had not formed—and the government had failed to prove—the requisite intent for defendant to be convicted of bank fraud. He now moves to be relieved from appellate representation under *Anders*, but may be seeking relief for other reasons.

### B. *Background on* Anders *Brief*

We set forth the events leading up to the *Anders* motion. Judgment was entered against Burnett on March 16, 1992 and a timely notice of appeal was filed. On May 14, 1992 defense counsel filed a motion for an extension of time to file a brief on the ground that he was under great strain from having to care for his aged and suddenly invalid mother. On May 26 the attorney filed another motion for an extension of time on the ground that Burnett was unhappy with his representation and was trying to obtain other counsel. The first motion for an extension was granted on May 27, but the second motion was returned because of the pendency of the prior motion seeking the same relief.

Defendant's attorney did not comply with the revised scheduling order, and the appeal was therefore dismissed on June 30, 1992. On July 21, counsel filed a motion to reinstate the appeal, a motion to be relieved pursuant to *Anders*, and an *Anders* brief. The motion papers were returned promptly to him because they were incomplete in a number of particulars: there was no certificate of service, no appendix, no presentence report, no transcripts, and no letter to defendant Burnett explaining his right to file a *pro se* brief.

On July 24, 1992 Molloy filed an *Anders* brief, accompanied by a motion to reinstate the motion to be relieved and obtain an extension of time. These motions were granted the same day, and the *Anders*

brief was accepted for filing. On August 20, 1992 the government filed a brief responding to the substantive point raised in the *Anders* brief.

## II

### A. *Discussion of* Anders

■ This case presents the question of how we should handle a nonconforming *Anders* brief in a direct criminal appeal. *Anders* allows appointed counsel to request permission to withdraw from prosecuting a criminal appeal where, after thorough examination of the record of trial, counsel determines that the appeal is without merit and wholly frivolous. *Anders*, 386 U.S. at 744, 87 S.Ct. at 1400. The motion to be relieved must be accompanied by a brief that must identify, by record references, issues that have at least arguable merit supported by legal authority. *Id.* at 744–45, 87 S.Ct. at 1400.

*Anders* emphasized that counsel's representation of his or her client should be that of an "active advocate." *Id.* at 744, 87 S.Ct. at 1400; *see also Nell v. James*, 811 F.2d 100, 104 (2d Cir.1987) (instructing attorney to "search the record with care, and then to explain to an appellate court why there are no non-frivolous issues present"). *Nell* points out that after counsel has identified any possible issues for appeal, the appellate court decides whether those issues are frivolous. *Id.* at 103. It follows therefore that an attorney who fails to indicate what issues might exist and why pursuing them is frivolous is burdening the court by forcing it to perform counsel's task.

### B. *Defendant's Right to Counsel*

■ Further, counsel's responsibility under *Anders* is rooted in an indigent defendant's well-established right to effective assistance of counsel on his direct appeal from a conviction. *See Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). "*Anders*, in essence, recognizes a limited exception to the requirement articulated in

*Douglas* that indigent defendants receive representation on their first appeal as of right." *Penson v. Ohio,* 488 U.S. 75, 83, 109 S.Ct. 346, 351, 102 L.Ed.2d 300 (1988). Thus, an *Anders* brief performs a dual function: to assist the appellate court in reviewing the appeal and to insure that indigent criminal appellants receive effective assistance of counsel. *See McCoy v. Court of Appeals of Wisconsin,* 486 U.S. 429, 439, 108 S.Ct. 1895, 100 L.Ed.2d 440 (1988).

■ An appellate court therefore has two tasks on defense counsel's motion to be relieved: (1) it must be satisfied that counsel has diligently searched the record for any arguably meritorious issue in support of his client's appeal; and (2) in order to permit defense counsel to withdraw, it must be satisfied that defense counsel's declaration that the appeal would be frivolous is, in fact, legally correct. *See id.* at 442, 108 S.Ct. at 1904.

### C. *Application of Anders to Instant Case*

■ Under *Penson,* we may not independently determine the merits of an appeal, absent a properly prepared *Anders* brief. *Penson,* 488 U.S. at 81–82, 109 S.Ct. at 350. Acceptance of a non-conforming *Anders* brief is akin to a constructive denial of counsel. *See United States v. Zuluaga,* 981 F.2d 74, 75 (2d Cir.1992). *Zuluaga* stated that only by appointing new counsel to pursue the appeal, without first determining whether there are no non-frivolous arguments for reversal, is a defendant's right to counsel preserved. *Id.* We need not speculate whether an adequate *Anders* brief would have affected the outcome of the appeal, for such would render *Douglas* and *Anders* meaningless. As *Penson* observed, "[m]ere speculation that counsel would not have made a difference is no substitute for actual appellate advocacy, particularly when the court's speculation is itself unguided by the adversary process." 488 U.S. at 87, 109 S.Ct. at 353.

■ Here the standard articulated in *Anders* was not met. In reviewing 787 pages of trial transcripts, two potentially appealable issues were apparent: (1) a chart may have been improperly introduced into evidence over Molloy's objection that it was prejudicial; and (2) throughout the trial Molloy attempted to show that the prosecution had not met its burden of proof on the intent element of the crime of check kiting or in substance that a *prima facie* case of bank fraud had not been demonstrated. His cross-examination of every witness centered on this theme. This argument culminated in a Fed.R.Crim.P. 29(a) motion for acquittal before submission to the jury and formed the basis for the defense's closing argument. Molloy's *Anders* brief consisting solely of one and a half pages of argument is inadequate because it does not explain why neither the objection to the chart nor the insufficiency of the evidence claims are now frivolous grounds for an appeal.

### III

*Fixing Compensation Under Anders*

We turn now to consider the consequences of this dereliction of duty. The Federal Rules of Criminal Procedure provide for assignment of counsel for every defendant unable to obtain such help at every stage of a criminal proceeding through appeal. Fed.R.Crim.P. 44(a). The procedures for implementing this right to assignment of counsel is established by law and by the local rules of this Court. Fed.R.Crim.P. 44(b).

A plan for furnishing such representation, including counsel's appointment, duration, substitution, payment and the like, are set forth in 18 U.S.C. § 3006A. The statute makes clear that "the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings." § 3006A(c). Subdivision (d) of the section sets forth the payment for representation. Subdivision (d)(1) establishes the hourly rate, (d)(2) provides that for representation before an appellate court compensation shall not exceed $2,500 for each attorney, and (d)(3) provides for excess payment beyond that set forth in (d)(2) "whenever the court in which the

representation was rendered ... certifies that the amount of the excess payment is necessary to provide fair compensation and the payment is approved by the chief judge of the circuit."

■ While there is no specific statutory provision for a court to decline certification of payment for representation, we think it implied in the broad grant of discretion to make a substitution of counsel in the interest of justice, and in the authority to award payment in excess of maximum statutory amounts. If a court can award more than is called for by statute it can award less. *See United States ex rel. Bibbs v. Twomey,* 538 F.2d 151, 154 (7th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1126, 51 L.Ed.2d 551 (1977) (per curiam) (discretion under § 3006A to fix compensation at less than statutory rates). Less can be down to no award of counsel fees where the circumstances so warrant, particularly since § 3006A(d)(1) provides only that an attorney shall be compensated for expenses "reasonably" incurred. We exercise our authority to decline to grant a fee award in appropriate circumstances. *See United States v. Melendez–Carrion,* 804 F.2d 7, 9 (2d Cir.1986) (Newman, J., in chambers) (attempts to claim improper payments will place at risk claims for legal fees and expenses), *aff'd by panel,* 811 F.2d 780 (2d Cir.1987); *In re Snyder,* 472 U.S. 634, 646, 105 S.Ct. 2874, 2881, 86 L.Ed.2d 504 (1985) (refusal to submit adequate documentation for fee can afford basis for declining award). We find that expenses incurred by Molloy were not reasonably incurred due to his wholly inadequate *Anders* brief.

■ We also recognize that appointment of new counsel and denial of CJA fees is justified where, as here, the *Anders* brief is for all practical purposes worthless. There may be cases that arise where an *Anders* brief is sufficient in some respects but inadequate as to others. In such a case, the panel hearing the appeal may, in its discretion, direct counsel to more fully address those issues the panel believes are insufficiently articulated. An award of CJA fees would thereafter be made in the discretion of the junior active judge.

## CONCLUSION

Where the *Anders* brief is entirely inadequate, the government's motion for summary affirmance must be denied and new counsel appointed. *See Zuluaga,* 981 F.2d at 75. For the reasons stated, no compensation shall be granted attorney Molloy for his services in preparing and filing the inadequate *Anders* brief. Counsel's motion to be relieved pursuant to *Anders* is denied; he is nonetheless removed pursuant to 18 U.S.C. § 3006A(c) and new counsel should be appointed in his place. The government's motion for summary affirmance is denied.