John S. PEREIRA, Esq., as Chapter 11 Trustee of Estate of Payroll Express Corporation et al., Plaintiff,

v.

UNITED JERSEY BANK, N.A., Defendant.

John S. PEREIRA, Esq., as Chapter 11 Trustee of Estate of Payroll Express Corporation et al., Plaintiff,

v.

NATIONAL WESTMINSTER BANK NEW JERSEY, Defendant.

BETH ISRAEL MEDICAL CENTER, et al., Plaintiffs,

v.

UNITED JERSEY BANK and National Westminster Bank New Jersey, Defendants.

FREDERICK GOLDMAN, INC., Plaintiff,

v.

UNITED JERSEY BANK and National Westminster Bank New Jersey, Defendants.

NEW YORK CITY TRANSIT AUTHORITY, Plaintiff,

v.

UNITED JERSEY BANK and National Westminster Bank New Jersey, Defendants.

COPYTONE, INC., on behalf of itself and all others similarly situated, Plaintiffs,

v.

UNITED JERSEY BANK, National Westminster Bank New Jersey, and John Does 1 Through 20, Defendants.

Nos. 94 Civ. 1565 (LAP), 94 Civ. 1844 (LAP), 94 Civ. 8256 (LAP), 95 Civ. 3685 (LAP), 95 Civ. 7955 (LAP) and 95 Civ. 8217 (LAP).

United States District Court, S.D. New York.

Oct. 11, 1996.

650

PRESKA, District Judge:

These actions arise from the wrongdoing and ultimate Chapter 11 bankruptcy of Payroll Express Corporation and Payroll Express Corporation of New York (collectively, "Payroll"), which operated a check cashing and payroll distribution business in New York and New Jersey. Plaintiffs Beth Israel Medical Center ("Beth Israel"), Frederick Goldman, Inc. ("Goldman"), New York City Transit Authority ("NYCTA"), and Copytone, Inc. ("Copytone") (collectively, the "Customers") are former customers of Payroll who were victims of Payroll's misappropriation of their money. Defendants United Jersey Bank, N.A. ("UJB") and National Westminster Bank New Jersey ("NatWest")

(collectively, the "Banks") are banks with whom Payroll maintained checking accounts and were the victims of Payroll's check-kiting scheme.

Plaintiff John S. Pereira ("Pereira"), Payroll's Chapter 11 trustee, filed suit against UJB and NatWest to avoid and recover allegedly preferential transfers to UJB and NatWest under 11 U.S.C. §§ 547(b) and 550(a). UJB and NatWest have moved, and Pereira has cross-moved, under Rule 56 of the Federal Rules of Civil Procedure for summary judgment. The Customers filed suit against UJB and NatWest asserting various common law claims based on the Banks' involvement with Payroll and efforts to recover their losses created by Payroll's check-kiting. UJB and NatWest have moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss these claims.

For the following reasons, the cross-motions for summary judgment of the Banks and Pereira are denied; and the Banks' motions to dismiss are granted as to certain claims and denied as to other claims which are stayed pending the resolution of Pereira's preference actions.

## TABLE OF CONTENTS

BACKGROUND .................................................................653

BANKRUPTCY TRUSTEE'S ACTIONS .........................................654
 I. Summary Judgment Standard ..........................................655
 II. Preferential Transfers ...............................................656
 A. Transfer of Payroll's Property Interest..........................656
 B. Antecedent Debt Owed by Payroll ..............................657
 C. Hypothetical Chapter 7 Liquidation ............................658
 III. Affirmative Defenses to Preference ..................................660
 A. Contemporaneous Exchange ....................................660
 B. Ordinary Course of Business....................................660
 C. Setoff........................................................660
 IV. Genuine Issues of Material Fact .....................................663

CUSTOMERS' ACTIONS........................................................663
 I. Motion to Dismiss Standard.........................................663
 II. Alleged Facts ......................................................663
 A. Customers' Agreements with Payroll ...........................663
 B. Payroll's Wrongful Conduct ....................................664
 C. Customers' Losses .............................................665
 D. Banks' Wrongful Conduct ......................................665
 III. Choice of Law .....................................................667
 IV. Customers' Claims .................................................669
 A. Negligence ....................................................669
 B. Aiding and Abetting ...........................................671
 C. Breach of Fiduciary Duty ......................................672
 D. Fraud and Equitable Fraud ....................................673
 E. Conspiracy to Conceal Payroll's Check–Kiting ..................674
 F. Conversion ....................................................675
 G. Setoff Claims .................................................676

CONCLUSION ................................................................681

---

## BACKGROUND

Payroll began its on-site check cashing services in 1967. Typically, the Customers would advance money to Payroll, whether by wire transfers, checks, or otherwise, a few days before each payday for Payroll to use to provide its services. Payroll then was generally required to return excess funds and endorsed paychecks to the Customers.

Robert Felzenberg ("Felzenberg") was President and, along with his wife, a co-owner of Payroll. Over the course of its dealings with the Customers, Payroll began to divert their advanced funds to other companies in which Felzenberg and his wife had

financial interests and to Felzenberg personally. As a result of these diversions, Payroll began to experience large cash shortages in 1991. Realizing the necessity of concealing its cash shortfall from the Customers in order to continue to receive their advances, Payroll engaged in a check-kiting scheme using its accounts at UJB and NatWest. Each day, Felzenberg would deposit a series of worthless checks from one account into the other and vice versa, taking advantage of the provisional credit which the Banks extended to Payroll upon depositing checks and pending the clearance of the checks through the drawee bank. In this manner, Payroll was able to deceive the Banks as well as the Customers.

By May 1992, however, the Banks uncovered Payroll's fraudulent conduct and, by taking measures to protect themselves, such as dishonoring checks drawn by Payroll on its accounts and applying funds deposited in Payroll's accounts to offset their losses, effectively brought both Payroll's check cashing business as well as its wrongdoing to an end. The Customers, unfortunately, did not discover Payroll's wrongdoing until they already made advances for which Payroll never provided check cashing services.

On June 5, 1992, Payroll filed petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. These proceedings were subsequently transferred to the United States Bankruptcy Court for the Southern District of New York. Also in June 1992, a federal criminal complaint was filed against Felzenberg. On July 13, 1993, Felzenberg pleaded guilty to a four count information, charging Felzenberg with defrauding public agencies of funds, conspiracy to commit wire fraud, bank fraud, and aiding and abetting in the preparation and filing of false tax returns. The instant actions address the appropriate manner in which the losses created by Payroll's wrongful conduct should be allocated.

### BANKRUPTCY TRUSTEE'S ACTIONS

Pereira filed adversary proceedings against the Banks under 11 U.S.C. §§ 547(b) and 550(a), alleging that the Banks, through their conduct in recovering some or all of their losses, received preferential transfers that must be returned to Payroll's estate for distribution according to the Bankruptcy Code. By Order of this Court, the reference of these proceedings to the United States Bankruptcy Court for the Southern District of New York was withdrawn in October 1994.

According to Pereira, Payroll's NatWest account experienced its largest deficit due to the check-kiting on April 30, 1992. (Pereira's NatWest Compl. ¶ 23.) This deficit was $13,-340,748.01. (Id.) On May 19, 1992, NatWest accepted for deposit $11,145,000 in checks drawn on Payroll's UJB account and which UJB subsequently paid. (Id. ¶ 24.) On May 21, 1992, upon uncovering Payroll's check-kiting, NatWest froze Payroll's NatWest account and began dishonoring checks drawn on this account. (Id. ¶ 26.) These checks totalled $31,713,350 and were deposited by Payroll into its UJB account. (Id.) Further, NatWest accepted a deposit of $11,607,550 in checks drawn on Payroll's UJB account and which UJB subsequently paid. (Id. ¶ 28.) In this manner, Pereira alleges that NatWest was able to transform the peak deficit of $13,340,748.01 into a positive balance of $2,017,756.90 by May 26, 1992. (Id. ¶ 30.) Pereira seeks to recover this sum of $13,340,-748.01 from NatWest as a preferential transfer. (Id. ¶ 39.)

As for UJB, Pereira alleges that on May 22, 1992, upon learning from NatWest of Payroll's check-kiting, UJB similarly froze Payroll's account and began dishonoring checks drawn on Payroll's UJB account. (Pereira's UJB Compl. ¶¶ 34–35.) By this point, however, UJB had recently paid millions of dollars for checks drawn on Payroll's UJB account and deposited in its NatWest account. (Id. ¶ 31.) Further, check deposits drawn on Payroll's NatWest account and deposited in its UJB account were dishonored by NatWest. (Id. ¶ 32.) In order to recover these losses, according to Pereira, UJB continued to accept deposits into Payroll's account in the form of wire transfers and checks and it applied these deposits to offset its losses. (Id. ¶¶ 35–37.) Pereira seeks to recover $15,443,537.54 in funds which allegedly were transferred and cleared into Pay-

roll's UJB account after May 22, 1992, and $1,570,000 in funds which allegedly were wire transferred from Payroll's account at Nat-West on May 27, 1992. (*Id.* ¶ 44.)

The Banks have moved, and Pereira has cross-moved, for summary judgment. Because genuine issues of material fact exist, these motions are denied.

## I. *Summary Judgment Standard*

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994); *see* Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if application of the relevant substantive law requires their determination. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

"A party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996); *accord Chambers*, 43 F.3d at 36. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *accord Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words,

does not bear the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "affidavits, depositions, or other sworn evidence as permitted by Fed. R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule*, 85 F.3d at 1011; *accord* Fed.R.Civ.P. 56(e); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Instead, the nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise.' " *Trans Sport v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citation omitted). Further, "a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony," unless "his subsequent sworn testimony . . . amplifies or explains, but does not merely contradict, his prior testimony . . ., especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *Rule*, 85 F.3d at 1011.

"In ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Id.; accord Chambers*, 43 F.3d at 36. "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." *Rule*, 85 F.3d at 1011. Accordingly, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Id.* Similarly, "[a]ny weighing of the evidence is the prerogative of the finder of fact." *Id.* "If, as to the issue on which summary judgment is sought, there is any evidence in the record

from any source from which a *reasonable* inference could be drawn in favor of the moving party, summary judgment is improper." *Chambers,* 43 F.3d at 37 (emphasis added).

## II. *Preferential Transfers*

█ "In [11 U.S.C. § 547(b) ], Congress broadly authorized bankruptcy trustees to 'avoid any transfer of an interest of the debtor in property' if five conditions are satisfied and unless one of seven exceptions defined in subsection (c) is applicable." *Union Bank v. Wolas,* 502 U.S. 151, 154, 112 S.Ct. 527, 529, 116 L.Ed.2d 514 (1991) (quoting Section 547). More specifically, the trustee bears the burden of proving, 11 U.S.C. § 547(g), the existence of "any transfer of an interest of the debtor in property—":

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

 (A) the case were a case under chapter 7 of this title;

 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

█ Section 547 "is intended to serve two basic policies that are fairly described in the House Committee Report." *Union Bank,* 502 U.S. at 160, 112 S.Ct. at 532.

"First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution."

*Id.* at 161, 112 S.Ct. at 533 (citation omitted).

While Pereira argues that he has satisfied each of these elements as a matter of law, the Banks assert that Pereira has failed as a matter of law to show: (1) a transfer of an interest of Payroll; (2) an antecedent debt owed by Payroll prior to the transfer; and (3) that the Banks received more than they would have received under a Chapter 7 liquidation. UJB also argues that it has shown certain affirmative defenses as a matter of law. I will first discuss the relevant legal principles for these arguments and I will then turn to the genuine issues of material fact which preclude summary judgment.

### A. *Transfer of Property Interest of Payroll*

UJB initially argues that Pereira has failed to show that Payroll had a property interest in the deposits which he seeks to recover. Instead, UJB argues, in total contradiction to its position on its right of setoff and its position in the Customers' actions, that Payroll merely held the deposits as a constructive trustee for the benefit of the Customers.

█ "The Bankruptcy Code does not define 'property of the debtor.'" *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) (applying Section 547(b) before the 1984 amendments, which substituted "an interest of the debtor in property" for "property of the debtor"). Instead, it generally leaves the

resolution of this issue to state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *accord In re Kelton Motors, Inc.,* 97 F.3d 22, 25 (2d Cir.1996); Lawrence P. King, 4 *Collier on Bankruptcy* § 547.03[2], at 547–24, 547–25 (15th ed. 1996) [hereinafter *Collier* ].

■ Nevertheless, the Bankruptcy Code does provide some guidance on identifying property interests of the debtor. As the Supreme Court has instructed:

> Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—"property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. For guidance, then, we must turn to § 541, which delineates the scope of "property of the estate" and serves as the postpetition analog to § 547(b)'s "property of the debtor."

*Begier,* 496 U.S. at 58–59, 110 S.Ct. at 2263. Section 541(a)(1), in turn, provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). According to Section 541(d),

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Thus, "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.' Nor is such an equitable interest 'property of the debtor' for purposes of § 547(b)." *Begier,* 496 U.S. at 59, 110 S.Ct. at 2263.

**B.** *Antecedent Debt Owed by Payroll*

The Banks also contend Pereira has failed as a matter of law to show that any transfers of Payroll's property were "for or on account of an antecedent debt owed by [Payroll]." 11 U.S.C. § 547(b)(2). They rely on *In re Frigitemp Corp.,* 34 B.R. 1000 (S.D.N.Y.1983), *aff'd,* 753 F.2d 230 (2d Cir.1985) to argue that the only debt owed by Payroll was the result of their extensions of provisional credit upon receiving check deposits into Payroll's accounts, and that the mere extension of provisional credit does not create indebtedness for the purposes of Section 547(b).

In that case, the Chapter 11 trustee sought to recover deposits in the bankrupt's checking account which the bank applied to cover *routine* overdrafts and provisional credits. *Id.* at 1004. The Court held that "[d]ebtor-creditor significance for bankruptcy purposes may not indiscriminately be attached to what are in the commercial world treated as automatic bookkeeping entries made solely to facilitate the collection process, and made explicitly provisional under the UCC." *Id.* at 1016. The Court also held that "[t]he automatic set-offs of deposits against routine overdrafts meet all the requirements necessary to exclude them from treatment as preferential payments," for the "accounts were not frozen, and [the debtor] continued to write checks on the accounts, simultaneously with its deposits." *Id.* at 1018.

In the instant case, however, Pereira does not rely on routine provisional credits to satisfy the requirement of an antecedent debt. To the contrary, Pereira relies on Payroll's receipt of unauthorized loans from the Banks through its check-kiting to give rise to the requisite antecedent debt.

By check kiting, a person can mislead a bank into thinking that an account balance is higher than it actually is. A prerequisite to this type of criminal activity is to deal with banks whose policy is to credit a deposit when made, rather than crediting a check when it clears through the bank on which it is drawn. A person kiting checks revolves the same money through two or more accounts by, for example, depositing a check drawn on bank A into bank B, then depositing a check drawn on bank B into

bank A to cover the originally deposited check. Timing is of the essence to prevent checks from being returned for insufficient funds. The purpose of such an illegal scheme is to keep artificially high balances in more than one account so that "legitimate" checks can be drawn on accounts that actually have negative balances, while preventing the banks from discovering that these accounts are overdrawn.

*United States v. Burnett,* 989 F.2d 100, 102 (2d Cir.1993); *accord Williams v. United States,* 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982).

Such unauthorized loans from banks give rise to debt under the Bankruptcy Code. In *Walser,* a bank employee, in exchange for bribes of cash and jewelry, permitted the bankruptcy debtor to open accounts with the bank under fictitious names in order to conceal from the bank that the debtor, whose prior accounts with the bank were closed by order of the bank's officers, maintained accounts with the bank. *Walser v. International Union Bank,* 21 F.2d 294, 295 (2d Cir.1927). The employee also permitted the debtor to draw checks against uncollected deposits which were paid out of the bank's money and then subsequently covered by the debtor. *Id.* "It was, as the defendant contends, a misappropriation of the bank's money by [its employee], who turned the same over to [the debtor] on [the debtor's] promise to repay the amount before the misappropriation was discovered." *Id.* at 296. None of these transactions were reflected in the bank's records. *Id.* at 295. The Court of Appeals held that

[t]his made [the debtor] the bank's debtor. . . . He received the bank's money, knowing that [the bank's employee] had no authority to deal with it in this manner. In other words, he converted the bank's money, and became its debtor, within the meaning of the Bankruptcy Act. . . . That the transaction was not entered upon the books of the bank, or that its officers did

not know to whom [the employee] had paid the money . . . [,] is immaterial on the issue of his indebtedness to the bank.

*Id.* at 296.

██ More recent decisions from other circuits are in accord with the principle that check-kiting gives rise to a debt under the Bankruptcy Code. *See In re Montgomery,* 983 F.2d 1389, 1389 (6th Cir.1993) ("The debtors in this complex bankruptcy case operated a massive check kiting scheme through which they obtained what amounted to unauthorized loans from a number of different banks."); *In re Smith,* 966 F.2d 1527, 1532 (7th Cir.1992) ("In effect, the Debtor here obtained a loan from the Bank (through the check-kiting scheme) and used the loan proceeds to pay his debt to Baker & Schultz. We might say that the loan was unauthorized or obtained by fraud, but it was nevertheless in economic reality a loan."), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992); *In re Isbell,* 24 B.R. 234, 238 (Bankr. W.D.Mo.1982) ("[S]ome $23,918.38, was paid over to [Bank of Carthage] to cover the deficit created in the account in that bank by the check-kiting scheme. Therefore, for the reasons stated above, that transfer must be regarded as avoidable by the plaintiff trustee in bankruptcy. . . ."). Accordingly, Payroll's check-kiting may give rise to an antecedent debt under 11 U.S.C. § 547(b)(2).[1]

### C. *Hypothetical Chapter 7 Liquidation*

The Banks' final contention regarding the elements of a preference is that they are fully secured creditors and, therefore, Pereira has failed as a matter of law to show that they received more than they would have in a Chapter 7 liquidation without the contested transfers.

As to check deposits, the Banks argue that they were fully secured under N.J.Stat.Ann. § 12A:4–210,[2] entitled "[s]ecurity interest of collecting bank in items, accompanying documents and proceeds." Under this provision,

---

1. Even NatWest recognizes that "when a bank's customer engages in check-kiting, the bank is a victim in that it, in effect, makes an involuntary loan." (Reply Memorandum in Further Support of NatWest's Motion to Dismiss in *Beth Israel* at 11.)

2. Although formerly § 12A:4–208, this provision was moved to § 12A:4–210 effective June 1, 1995.

a. A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

(1) in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

\* \* \* \* \* \*

b. If credit given for several items received at one time or pursuant to a single agreement is withdrawn or applied in part, the security interest remains upon all items, any accompanying documents or the proceeds of either. For the purpose of this section, credits first given are first withdrawn.

c. Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. As long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues to that extent. . . .

N.J.Stat.Ann. § 12A:4–210 [hereinafter N.J.U.C.C. § 4–210].

 In the context of check deposits, subsection (a) protects banks which extend credit on the deposits prior to final settlement of the item—that is, while the bank is an agent of the depositor during the collection process, N.J.U.C.C. § 4–201—by giving the bank "a security interest in the check and the monies represented by the check to the extent that credit given for the check has been withdrawn or applied." *Citizens Nat'l Bank v. Fort Lee Sav. and Loan Ass'n*, 89 N.J.Super. 43, 213 A.2d 315, 319 (Law Div. 1965); *accord Farmers and Merchants Nat'l Bank v. Boardwalk Nat'l Bank*, 101 N.J.Su-

per. 528, 245 A.2d 35, 38–39 (Div.1968), *certif. denied*, 52 N.J. 492, 246 A.2d 452 (1968).[3] The mere giving of provisional credit is not sufficient to give rise to such a security interest. *See Marine Midland Bank New York v. Graybar Elec. Co., Inc.*, 41 N.Y.2d 703, 395 N.Y.S.2d 403, 409–410, 363 N.E.2d 1139, 1144–46 (1977) (holding that a bank did not have a security interest, and thus did not give value for the purposes of being a holder in due course, by the mere extension of provisional credit); James J. White & Robert S. Summers, *Uniform Commercial Code* § 14–5, at 514–15 (4th ed. 1995) (same). Subsection (b) spreads the security interest over multiple items in certain circumstances and it adopts the "first-in, first-out" rule for determining which credits given by the bank actually have been withdrawn by the depositor. N.J.U.C.C. § 4–210 U.C.C. cmt. 2. Finally, subsection (c) reflects that in the typical scenario (*i.e.*, the drawee bank makes payment on the check), the collecting bank's security interest is self-liquidating. *Id.* U.C.C. cmt. 3.

UJB also relies on 11 U.S.C. § 506(a) to argue that it was fully secured as to both check deposits and wire transfers. Section 506(a) provides that "[a]n allowed claim of a creditor . . . that is subject to setoff under section 553 of this title, is a secured claim . . . to the extent of the amount subject to setoff." 11 U.S.C. § 506(a). According to UJB, it has a right to use wire transfers for the purpose of setoff under Federal Reserve Board Regulation J, 12 C.F.R. pt. 210, subpt. B ("Regulation J"), which "provides rules to govern funds transfers through Fedwire," 12 C.F.R. § 210.25(a); and it has a right to use check deposits for the purpose of setoff under New Jersey common law and statutory law. These issues, upon which UJB's alleged Sec-

---

3. Pereira's attempt to superimpose the requirements for achieving holder in due course status onto those found in N.J.U.C.C. § 4–210 is without merit. In fact, the relationship between these provisions is quite the contrary. While the existence of a security interest under N.J.U.C.C. § 4–210 satisfies the "holder for value" requirement of attaining holder in due course status, *e.g., Farmers and Merchants*, 245 A.2d at 38–39, a bank still needs to comply with the other require-

ments, such as the good faith requirement, to be considered a holder in due course. N.J.U.C.C. § 4–210, U.C.C. cmt. 1. Pereira, however, attempts to argue that the converse scenario holds true: that holder in due course status is part of the security interest analysis. Accordingly, his arguments as to the Banks' frame of mind are not relevant to determining the existence of a security interest under N.J.U.C.C. § 4–210.

tion 506(a) security interest depend, are discussed in detail *infra* at 660–63.[4]

### III. *Affirmative Defenses to Preference*

In addition to arguing that Pereira has not satisfied certain elements of a preference as a matter of law, UJB argues that even if Pereira satisfied these elements, UJB has proven certain affirmative defenses as a matter of law, thus requiring summary judgment in its favor.

### A. *Contemporaneous Exchange*

■ UJB's first affirmative defense is found in 11 U.S.C. § 547(c)(1), which provides that "[t]he trustee may not avoid under this section a transfer—":

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1). "New value" is defined as:

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

*Id.* § 547(a)(2). This provision is "designed to encourage creditors to continue to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment." *Barnhill v. Johnson,* 503 U.S. 393, 402, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992).

### B. *Ordinary Course of Business*

■ UJB also relies on the ordinary course of business affirmative defense found in 11 U.S.C. § 547(c)(2). According to this provision, "[t]he trustee may not avoid under this section a transfer—":

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). Congress created this exception "[w]hen [it] rewrote the preference provision in the 1978 Bankruptcy Code." *Union Bank,* 502 U.S. at 159, 112 S.Ct. at 532. "This exception was intended to 'leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'" *Id.* at 160, 112 S.Ct. at 532 (citation omitted).

### C. *Setoff*

■ Finally, UJB argues that it properly exercised its setoff rights under Bankruptcy Code Section 553, which provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 553(a). "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts

---

**4.** Pereira argued at oral argument that UJB may not rely on Section 506(a) because it would be applicable only if UJB had not exercised its setoff rights and then filed an allowed claim against Payroll's estate. Pereira's argument, however, overlooks that UJB raises Section 506(a) for the very purpose of arguing that *if* it had not exercised its setoff rights, it would not have received less under a Chapter 7 liquidation because Section 506(a) would provide UJB with a secured claim to the extent of its right of setoff under Section 553.

against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.' " *Citizens Bank of Maryland v. Strumpf*, —— U.S. ——, ——, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)). If a party properly exercises its right of setoff, then the transfer "may not be recovered as a preferential transfer." *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir.1976) (citing *New York County Nat'l Bank v. Massey*, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904)).

 Determining the validity of a setoff requires an assessment of non-bankruptcy and bankruptcy law, for Section 553 does not create a federal right of setoff; it merely "provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Strumpf*, —— U.S. at ——, 116 S.Ct. at 289; *accord In re Chateaugay Corp.*, 94 F.3d 772, 777 n. 5 (2d Cir.1996); *In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 839 (Bankr.S.D.N.Y.1990). Even if the right exists under non-bankruptcy law, however, "whether a setoff of existing obligations may be effected or sustained in bankruptcy depends upon the terms of section 553 [of the Bankruptcy Code], and not upon the terms of state laws or statutes." *Collier* § 553.06, at 553–39; *accord Fore Improvement Corp. v. Selig*, 278 F.2d 143, 145 (2d Cir.1960) ("[T]he right to set-off is determined by the provisions of section [553] of the Bankruptcy [Code], notwithstanding the fact that the obligations involved are creatures of state law.") (footnote omitted).

UJB relies on Regulation J for its right to setoff wire transfers, and New Jersey common law and statutory law[5] for its right to setoff check deposits. Pereira argues that both New Jersey law and federal bankruptcy law limit UJB's right of setoff on the facts of this case.

As for New Jersey law, the Appellate Division in *Morrison Steel* discussed one of its limitations on a bank's right to setoff deposits:

It is everywhere recognized that where a bank has knowledge that deposits made by a debtor in his own name are in fact the property of a third person, or that some third person has an interest therein, then no right of set-off may properly be asserted. A similar rule should apply where the bank has knowledge or notice of such facts as to put it upon inquiry as to the true character of the deposit.... Accordingly, if the trial court should find, after receiving evidence directed to the issue, that such knowledge or notice existed on the part of the bank, it would follow that the right of set-off had been improperly exercised.

*Morrison Steel Co. v. Gurtman*, 113 N.J.Super. 474, 274 A.2d 306, 311 (App.Div.1971); *accord Hudson United Bank v. House of Supreme, Inc.*, 149 N.J.Super. 153, 373 A.2d 438, 440 (Ch. Div.1977) ("Funds deposited in a bank for a special purpose made known to the bank or under a special agreement cannot be set off by the bank against a debt due to it from the depositor."). The Court in *Morrison Steel* held that this limitation "is unaffected by the Uniform Commercial Code." *Morrison Steel*, 274 A.2d at 310.

 Federal bankruptcy law also imposes limitations on banks' setoff rights. First, a bank may be equitably estopped from exercising this right. As the Court of Appeals has stated,

[i]t is indeed settled law that a bank cannot exercise a setoff against a deposit which is known by it to be dedicated to a special use, *e.g.*, for the sole purpose of meeting payrolls or paying taxes.... If in fact such deposits were "made in trust," as some courts have said, or constituted contracts between the depositor and the bank for the benefit of a third party who could enforce it against the bank, the cases could be explained on the simple ground that the situation was not one of "mutual debts or credits," to which alone § [553] applies. However, the principle seems to go beyond such cases and to include others where courts say that the bank is "equita-

---

5. In particular, UJB relies on N.J.U.C.C. § 4–214, entitled, in part, "[r]ight of charge-back or refund." (Although formerly § 4–212, this provi- sion was moved to § 4–214 effective June 1, 1995.)

bly estopped from a setoff." What this really means is that by accepting the deposit for a special purpose the bank has agreed, at least implicitly, that the deposit should not be subject to its claims against the depositor and that it will be held to such agreement.

*In re Applied Logic Corp.*, 576 F.2d 952, 958 (2d Cir.1978).

 Second, Section 553(a)(3) prohibits a setoff to the extent that

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

 (A) after 90 days before the date of the filing of the petition;

 (B) while the debtor was insolvent; and

 (C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a)(3). "Except for the change in the time period, this largely codifies existing case law." *Applied Logic*, 576 F.2d at 958 n. 15. An example of such case law is *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir.1976), wherein the Court of Appeals held that in the context of bank deposits, a bank's right of setoff

applies only to deposits made in good faith, in the due course of business, [and] which are subject to withdrawal at the will of the depositor. The set-off exception does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor.

*Id.* at 557; *see Collier* § 553.15[3], at 553–74, 553–75 ("But if the deposits are not accepted in the ordinary course of business, or are procured, accepted or 'built-up' for the real purpose of permitting the bank to obtain a setoff, the deposits will be considered preferential in effect and the right of setoff is lost. . . .") (footnotes omitted).

**6.** I am not persuaded by UJB's effort to preclude Pereira from raising Section 553(b) by arguing that it is an independent cause of action which Pereira was required to plead and which is now barred by the applicable statute of limitations. Pereira's reliance on Section 553(b) is in response to UJB's heavy reliance on Section 553(a), which begins with the phrase, "Except as otherwise provided in this section." 11 U.S.C. § 553(a). Subsection (b) is within Section 553. Further, even if UJB's contentions had merit,

 Third, the "improvement in position test" of Section 553(b) further restricts the extent of an otherwise lawful setoff.[6] This Section states:

(b)(1) . . . [I]f a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

 (A) 90 days before the filing of the petition; and

 (B) the first day during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C. § 553(b). "Thus, [a court] must determine (a) the amount of any insufficiency on the date of the setoff and (b) the insufficiency 90 days prior to the date of the filing of the petition, or the first date during the 90 days when an insufficiency existed." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1040 (5th Cir.1987).

The concern of Congress in enacting the improvement in position test was that creditors, primarily banks, that had mutual accounts with the debtor would foresee the approach of bankruptcy and scramble to secure a better position for themselves by decreasing the "insufficiency," to the detriment of other creditors. Such a circumstance would not be improbable if banks

Rule 15 of the Federal Rules of Civil Procedure provides that "leave [to amend] shall be freely given when justice so requires," and that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15. Therefore, UJB's effort to avoid addressing the merits of Section 553(b) is unavailing.

were allowed to take advantage of any improvement in their position in the ninety days before bankruptcy.

*Lee v. Schweiker,* 739 F.2d 870, 877 (3d Cir. 1984).[7]

## IV. *Genuine Issues of Material Fact*

■ Upon applying the foregoing substantive principles to the summary judgment record in this action, I find that genuine issues of material fact exist which preclude summary judgment. These facts include, for example: the allocation of the legal and equitable interests in the Customers' advances to Payroll; the extent to which monies from Payroll's check-kiting, legitimate business revenues, and other sources also comprised Payroll's accounts; UJB's awareness of the legal and equitable interests in, sources of, and intended uses for the monies in Payroll's account; the perpetually fluctuating ebbs and flows of Payroll's account balances, as affected by its check-kiting and the host of other debits and credits which occurred during the relevant time period; the extent of any credit given by the Banks for particular check deposits, the extent to which such credit was withdrawn or applied, and the application of the first-in, first-out principle in N.J.U.C.C. § 4-210(b) in making these determinations; and the circumstances surrounding UJB's setoff, including UJB's intentions and knowledge. Accordingly, the Banks' motions and Pereira's cross-motions for summary judgment are denied.

### CUSTOMERS' ACTIONS

The Customers' actions against the Banks rely on a variety of common law theories. They allege that the Banks' course of dealing with Payroll and their efforts to offset their losses in May 1992 constituted negligence; aiding and abetting Payroll's wrongful conduct; breach of fiduciary duty; fraud; equitable fraud; conspiracy to conceal Payroll's check-kiting; conversion; conspiracy to convert; constructive trust; unjust enrichment; monies had and received; and restitution of payments by mistake. The Banks have moved under Rule 12(b)(6) to dismiss these actions.

## I. *Motion to Dismiss Standard*

"'A motion to dismiss is designed to test the legal sufficiency of the complaint, and thus does not require the Court to examine the evidence at issue.'" *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996) (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 509, —— L.Ed.2d —— (1996). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all well-pleaded factual allegations in the [c]omplaint and view them in the light most favorable to [p]laintiffs." *Id. accord Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). The complaint is deemed to include all papers and exhibits appended to it, statements or documents incorporated in it by reference, and any matters of which judicial notice may be taken. *De Jesus,* 87 F.3d at 69; *Hirsch,* 72 F.3d at 1092; *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## II. *Alleged Facts*

### A. *Customers' Agreements with Payroll*

Thus, for the purposes of the Banks' motions to dismiss, the facts of the Customers' actions are as follows. Until May 1992, Pay-

---

7. *Collier* provides an illustration of this provision:

> For example, assume that a debtor owes a bank $15,000 and has $9,000 on deposit 90 days prior to filing. If the bank exercises its right of setoff 30 days before filing when the debtor's account contains $11,000, the bank will recover all but $4,000 of the amount owed to it. Thus, by waiting 60 days before exercising its right of setoff, the bank recovered an additional $2,000, and therefore improved its position by $2,000, the amount that the trustee may recover for the estate under section 553(b).

> *Collier* § 553.15[2], at 553–72 (footnote omitted).

roll provided its check cashing services to the Customers pursuant to various payroll distribution agreements (the "Customers' Agreements"). (Beth Israel Compl. ¶ 32; Goldman Compl. ¶ 7; NYCTA Compl. ¶ 7; Copytone Compl. ¶ 58.) According to the Customers' Agreements, the Customers advanced funds to Payroll prior to each payday for the sole purpose of Payroll's provision of its on-site payroll check cashing services for the Customers' employees. (Beth Israel Compl. ¶¶ 2–3; Goldman Compl. ¶ 7–8; NYCTA Compl. ¶¶ 7–8; Copytone Compl. ¶¶ 2, 32.)

In general, the Customers' Agreements provided that these advances took the form of wire transfers to Payroll's account at UJB. (Beth Israel Compl. ¶ 2; Goldman Compl. ¶ 7; Copytone Compl. ¶ 32.) Upon completion of its check cashing services, the Customers' Agreements required Payroll to return the endorsed payroll checks of the Customers' employees by depositing them directly into accounts designated by the Customers. (Beth Israel Compl. ¶ 4; Goldman Compl. ¶ 9; NYCTA Compl. ¶ 8; Copytone Compl. ¶ 34.) The Customers' Agreements similarly required Payroll to return any previously advanced but unused funds. (Beth Israel Compl. ¶ 4; Goldman Compl. ¶ 9; NYCTA Compl. ¶ 8; Copytone Compl. ¶ 34.) Payroll's compensation from the Customers was dependent on the number of checks which it cashed. (Beth Israel Compl. ¶ 5; Goldman Compl. ¶ 10.)

Payroll's agreements with plaintiff Hebrew Home for the Aged at Riverdale ("Hebrew Home"), 94 Civ. 8256, and plaintiff NYCTA, 95 Civ. 3685, varied slightly from the other Customers' Agreements described above. Hebrew Home maintained a standing deposit with Payroll of $238,000, from which Payroll was to obtain funds to cash payroll checks of Hebrew Home's employees. (Beth Israel Compl. ¶ 34.) Further, Payroll did not deposit the endorsed payroll checks into Hebrew Home's own account; instead, Payroll deposited these checks into its own account

at UJB to maintain the standing deposit for the next provision of its check cashing services. (*Id.*)

As for NYCTA, it transferred money from its general operating account at Chemical Bank to its special payroll account at Chemical Bank two days before each payday. (NYCTA Compl. ¶ 8.) Payroll then withdrew funds by writing a check on NYCTA's special payroll account, and often would deposit this sum into its accounts at UJB or NatWest. (*Id.* ¶¶ 8–9.) Payroll was required not to commingle NYCTA funds with other funds and the cash advances were to remain the property of NYCTA. (*Id.* at 9.)

### B. *Payroll's Wrongful Conduct*

Stretching back at least over the past two decades, Felzenberg, President of Payroll, engaged in a pattern of fraud by draining the Customers' monies which were advanced and given to Payroll in connection with its check cashing and distribution services. (Copytone Compl. ¶ 39.) Felzenberg transferred these monies, without the Customers' knowledge or consent, to himself and Payroll's affiliated entities. (*Id.* ¶ 40.) To conceal its diversion of the Customers' funds and thus the fact that Payroll did not have the funds necessary to conduct its check cashing business, Payroll began a check-kiting scheme in early 1991. (Beth Israel Compl. ¶ 46; Goldman Compl. ¶ 18; NYCTA Compl. ¶ 10; Copytone Compl. ¶ 41.)

This check-kiting allowed Payroll to create falsely inflated balances in its accounts at UJB and NatWest by depositing into each account worthless checks that Payroll drew on the other account. (Beth Israel Compl. ¶ 46; Goldman Compl. ¶ 18; NYCTA Compl. ¶ 11.) Payroll was able to create and maintain these fictitious balances by taking advantage of the provisional credit which UJB and NatWest extended to Payroll during the period of time after Payroll deposited a check drawn on the other bank account and before the check cleared the drawee bank.[8] (NYC-

---

8. Although the Customers greatly emphasize the Banks' extension of this provisional credit,

> [u]nder current bank practices, in a major portion of cases banks make provisional settlement for items when they are first received and then

await subsequent determination of whether the item will be finally paid.... Statistically, this practice of settling provisionally first and then awaiting final payment is justified because the vast majority of such cash items are finally paid,

TA Compl. ¶ 11.) During 1991 and 1992, as Payroll experienced greater shortages of cash, the extent of this check-kiting grew accordingly. At the height of its scheme, Payroll deposited on a daily basis into its accounts at UJB and NatWest worthless checks of over $10 million drawn on its account at the other bank. (Beth Israel Compl. ¶ 48; Goldman Compl. ¶ 20.) Nat-West discovered this check-kiting and froze Payroll's account on May 21, 1992. (Beth Israel Compl. ¶ 54; Goldman Compl. ¶ 26; NYCTA Compl. ¶ 28; Copytone Compl. ¶ 65.) UJB froze its Payroll account on May 22, 1992. (Beth Israel Compl. ¶ 59; Goldman Compl. ¶ 27; NYCTA Compl. ¶ 32; Copytone Compl. ¶ 65.)

The Banks' actions rendered Payroll unable to continue either its wrongdoing or its business. (Beth Israel Compl. ¶ 83; NYCTA Compl. ¶¶ 7, 33.) Accordingly, on June 5, 1992, Payroll and certain of its affiliated entities filed petitions in bankruptcy court seeking relief under Chapter 11 of the Bankruptcy Code. On July 13, 1993, Felzenberg pled guilty to four counts of fraudulent conduct, including conspiring to commit wire fraud on Payroll's customers. (Copytone Compl. ¶ 43.) Felzenberg's allocution included an admission that Payroll concealed from its customers that Payroll lacked sufficient funds to conduct its check cashing business. (*Id.* ¶ 44.) On March 21, 1994, Felzenberg was sentenced to a term of prison followed by a term of supervised release and $25 million in restitution. (*Id.* ¶ 46.)

### C. *Customers' Losses*

The Customers did not discover either Payroll's wrongdoing or the Banks' freezing of Payroll's accounts until after they sustained substantial losses. In the *Beth Israel* action, 94 Civ. 8256, the Customers' losses stem from three sources: their wire transfers into Payroll's UJB account after UJB froze this account (Beth Israel Compl. ¶¶ 64–79); Payroll's wrongful deposits of endorsed

payroll checks, primarily into its account at UJB and to a lesser extent into its account at NatWest (none of these checks cleared until after the Banks froze the accounts) (*id.* ¶¶ 85–126); and Payroll's wrongful deposits of excess cash into its UJB account (*id.* ¶¶ 127–135).

In the *Goldman* action, 94 Civ. 8256, Goldman seeks to recover a wire transfer into Payroll's UJB account after UJB froze this account (Goldman Compl. ¶ 34), and it seeks to recover excess funds of $39,726.20 from a pre-existing but unused wire transfer to Payroll's UJB account (*id.* ¶ 35). In the *NYCTA* action, 95 Civ. 3685, NYCTA seeks to recover its advances to Payroll totaling $2,097,167.76 which Payroll deposited into its UJB and NatWest accounts after the accounts were frozen. (NYCTA Compl. ¶¶ 35, 42.)

Finally, in the *Copytone* actions, 95 Civ. 7955 and 95 Civ. 8217,[9] the Customers (including putative class members) seek to recover proceeds from endorsed payroll checks which Payroll wrongfully deposited into one of its accounts after the Banks froze Payroll's accounts (Copytone Compl. ¶¶ 56–57); a wire transfer into Payroll's UJB account subsequent to UJB freezing this account (*id.* ¶ 58); and putative class members' losses, including endorsed payroll checks, excess funds, and security deposits existing in escrow in Payroll's accounts (*id.* ¶ 59).

### D. *Banks' Wrongful Conduct*

According to the Customers, the Banks are liable for these losses. NatWest's involvement with Payroll began in 1969, when Payroll established an account with First New Jersey National Bank, a predecessor to Nat-West. (Copytone Compl. ¶ 25.) From about 1980 to 1989, NatWest provided Payroll with a generous daylight overdraft credit which ultimately reached $4 million. (*Id.* ¶ 36(a).) At least as early as 1989, however, NatWest learned that Payroll, without NatWest's

---

with the result that in this great preponderance of cases it becomes unnecessary for the banks making the provisional settlements to make any further entries. In due course the provisional settlements become final simply with the lapse of time.

N.J.U.C.C. § 4–214 cmt. ¶ 1.

9. These separate civil action numbers are a result of the separate removals by UJB and Nat-West of the same New York State court action to this Court.

knowledge or approval, used millions of dollars of its capital for investments unrelated to its check cashing business, that it pledged certain assets to First Fidelity Bank, and that it failed to conform to bank policy regarding the submission of certified financial statements. (Beth Israel Compl. ¶ 37; NYCTA Compl. ¶ 21; Copytone Compl. ¶¶ 36(a), 36(c).) Consequently, NatWest terminated all formal extensions of credit to Payroll, but permitted Payroll to maintain its checking account at NatWest and it continued to permit Payroll to draw checks against unavailable funds. (Beth Israel Compl. ¶ 37; NYCTA Compl. ¶¶ 22–23; Copytone Compl. ¶ 36(b).) NatWest's problems with Payroll continued into early 1992, causing NatWest to meet with Felzenberg numerous times to attempt to rectify the problems. (Beth Israel Compl. ¶¶ 49–52; Goldman Compl. ¶¶ 21–24; NYCTA Compl. ¶¶ 24–27.) Nevertheless, NatWest continued to permit Payroll to draw against uncollected funds, permitting Payroll to falsely inflate its balance in its account. (Beth Israel Compl. ¶ 51; NYCTA Compl. ¶ 11.)

However, after reviewing Payroll's records for May 19, 1992 and realizing that of $11.4 million worth of checks deposited that day $11.1 million were drawn on Payroll's UJB account, NatWest suspected that Payroll was engaged in check-kiting and froze Payroll's account on May 21, 1992. (Beth Israel Compl. ¶¶ 53–54; Goldman Compl. ¶¶ 25–26; NYCTA Compl. ¶¶ 28–29.) NatWest began to dishonor checks exceeding $32 million which Payroll drew on its NatWest account and deposited into its UJB account. (Beth Israel Compl. ¶ 54; Goldman Compl. ¶¶ 26–27; NYCTA Compl. ¶ 30.) At the same time, NatWest applied Payroll's deposits from endorsed paychecks, excess funds advanced to Payroll, checks which Payroll drew on NYCTA's special payroll account, and the Customers' security deposits to offset NatWest's losses sustained from Payroll's check-kiting. (Beth Israel Compl. ¶¶ 11, 86; NYCTA Compl. ¶ 34; Copytone Compl. ¶¶ 59–60.) In addition to taking these protective measures, NatWest informed UJB on May 22, 1992 of its actions and of Payroll's check-kiting scheme. (Beth Israel Compl. ¶ 58; Goldman Compl. ¶ 27; NYCTA Compl. ¶ 31.) Because

NatWest discovered the check-kiting first, it was able to shift most of the loss created thereby to UJB. (Goldman Compl. ¶ 14.)

The Customers allege that NatWest should have been aware of Payroll's check-kiting scheme since at least June 1991, because a review of Payroll's deposits and withdrawals during this time immediately would have revealed this scheme. (Beth Israel Compl. ¶¶ 56–57; Goldman Compl. ¶¶ 32–33; NYCTA Compl. ¶ 36.) Further, due to its longstanding relationship with Payroll, NatWest was aware of the nature of Payroll's business and that the funds deposited into Payroll's accounts were not Payroll's profits or earnings, but were advances from the Customers, held in escrow by Payroll, to be used solely to cash the Customers' employees paychecks. (Beth Israel Compl. ¶ 35; Goldman Compl. ¶ 17; NYCTA Compl. ¶¶ 12–13; Copytone Compl. ¶ 35.) NatWest also knew that the Customers were unaware of the check-kiting or the Banks' freezing of Payroll's accounts. (NYCTA Compl. ¶ 37; Copytone Compl. ¶ 70.) Finally, NatWest knew or should have known that Payroll was in an increasingly precarious financial situation, that Payroll diverted its funds for use by Felzenberg and its related entities, and that it would need to use the Customers' funds to repay its debts. (Copytone Compl. ¶¶ 47–49, 51–52.)

As for UJB, Payroll opened its account there in 1983. (Copytone Compl. ¶ 28.) By 1988, UJB learned that Felzenberg was using Payroll's capital for unrelated investments. (Beth Israel Compl. ¶ 38; NYCTA Compl. ¶ 15.) Further, Payroll consistently was out of compliance with UJB's financial reporting requirements; UJB officials suspected Payroll of check-kiting in 1989; UJB learned in 1990 that Payroll's outside accountants refused to certify its financial statements; and in 1991, UJB's credit analyst recommended not extending further credit to Payroll. (Beth Israel Compl. ¶¶ 39–42; NYCTA Compl. ¶¶ 17–20; Copytone Compl. ¶¶ 37, 53(j), 53(m).) Nevertheless, UJB continued to extend favorable treatment to Payroll. (Beth Israel Compl. ¶ 43; Copytone Compl. ¶¶ 37, 50.)

After learning of NatWest's decision to freeze its Payroll account, however, UJB followed the same course of action on May 22, 1992. (Beth Israel Compl. ¶¶ 7, 59; Goldman Compl. ¶¶ 11, 27; NYCTA Compl. ¶ 32; Copytone Compl. ¶ 60.) UJB also dishonored checks exceeding $20 million drawn on this account and deposited in Payroll's NatWest account (Beth Israel Compl. ¶ 59; NYCTA Compl. ¶ 32); and it attempted to recover its losses created by Payroll's check-kiting by setting-off against these losses wire transfers made by the Customers after the freeze on Payroll's account (Beth Israel Compl. ¶¶ 64–79; Goldman Compl. ¶¶ 28, 34), the proceeds of endorsed payroll checks deposited by Payroll (Beth Israel Compl. ¶¶ 85–123), and excess funds deposited by Payroll (*id.* ¶¶ 127–136), including funds from checks drawn by Payroll on NYCTA's special payroll account (NYCTA Compl. ¶¶ 34–35). UJB was able thereby to shift $24 million of its losses from Payroll's check-kiting to the Customers. (Beth Israel Compl. ¶ 63.)

As with NatWest, UJB allegedly should have been aware of Payroll's check-kiting since June 1991. (Beth Israel Compl. ¶¶ 55, 57; Goldman Compl. ¶¶ 31, 33; NYCTA Compl. ¶ 36.) UJB also was aware of the nature of Payroll's business from its extensive dealings with Payroll, including its daily oversight of Payroll's account during 1991 and 1992. (Beth Israel Compl. ¶¶ 35–36.) Thus, UJB was aware that funds in Payroll's account were held in escrow for cashing payroll checks of the Customers' employees. (Beth Israel Compl. ¶¶ 44–45; Goldman Compl. ¶¶ 12, 17; NYCTA Compl. ¶¶ 12–14; Copytone Compl. ¶ 35.) UJB also knew that the Customers were unaware at the time of their wire transfers to Payroll's UJB account that Payroll was engaged in check-kiting or that UJB had frozen Payroll's account. (Beth Israel Compl. ¶¶ 62, 82; Goldman Compl. ¶¶ 29, 38; NYCTA Compl. ¶ 37.) Further, UJB was aware since 1988 that Payroll was diverting millions of dollars of Payroll's capital for unrelated investments in insurance, securities, and shipping (Beth Israel Compl. ¶ 38; Goldman Compl. ¶ 38;

NYCTA Compl. ¶ 15; Copytone Compl. ¶¶ 48(a), 51(b).) Finally, UJB had reason to know, because of Payroll's precarious financial situation, that Payroll was unable to satisfy its financial obligations without using the Customers' funds. (Copytone Compl. ¶¶ 48(d), 49, 51(a), 53.)

As a result of the foregoing, the Customers sued the Banks, alleging a host of common law claims. The Customers in the *Beth Israel* action sued the Banks for constructive trust, unjust enrichment, monies had and received, conversion, aiding and abetting conversion, equitable fraud, aiding and abetting breach of fiduciary duty, and negligence. These Customers also sued UJB for restitution of payments by mistake, legal fraud, and breach of fiduciary duty. (Beth Israel Compl. ¶¶ 139–200.)

Goldman sued the Banks for aiding and abetting conversion, equitable fraud, aiding and abetting breach of fiduciary duty, and negligence. Goldman also sued UJB for constructive trust, unjust enrichment, monies had and received, restitution of payments by mistake, conversion, legal fraud, and breach of fiduciary duty. (Goldman Compl. ¶¶ 41–88.)

NYCTA sued the Banks for conversion, aiding and abetting conversion, legal fraud, equitable fraud, constructive trust, unjust enrichment, monies had and received, restitution of payments by mistake, and negligence. (NYCTA Compl. ¶¶ 44–80.)

Finally, the Customers in the *Copytone* actions sued the Banks for conversion, conspiracy to convert, conspiracy to conceal Payroll's check-kiting, aiding and abetting breach of fiduciary duty, legal fraud, aiding and abetting conversion, aiding and abetting fraud, negligence, and breach of fiduciary duty. (Copytone Compl. ¶¶ 63–118.)

### III. *Choice of Law*

 Although the Customers largely rely on the same legal theories, some disagreement exists as to whether New York or New Jersey tort law should govern their claims.[10] I find that New Jersey tort law

**10.** *See, e.g.,* Copytone's Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 2 n. 1.

governs. The *Beth Israel* and *Goldman* actions were transferred from the United States District Court for the District of New Jersey under 28 U.S.C. § 1404(a). Consequently, the law applicable to these claims is the same as if the actions remained in the District of New Jersey. *Ferens v. John Deere Co.*, 494 U.S. 516, 521–23, 110 S.Ct. 1274, 1278–80, 108 L.Ed.2d 443 (1990) (interpreting *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Further, the New Jersey District Court would apply the choice of law principles which the Supreme Court of the State of New Jersey would apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As for the *NYCTA* and *Copytone* actions, I must apply the choice of law principles which the Court of Appeals of the State of New York would apply, for the *NYCTA* action was filed originally in this Court and the *Copytone* actions were removed to this Court from New York State court. *Id.*

According to the New Jersey Supreme Court's "flexible governmental-interest analysis in choice-of-law decisions,"

> the determinative law is that of the state with the greatest interest in governing the particular issue.... The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis.... If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.... If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply.... Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

*Veazey v. Doremus*, 103 N.J. 244, 510 A.2d 1187, 1189–90 (1986).

The New York Court of Appeals similarly applies interest analysis as "the relevant an-

alytical approach to choice of law in tort actions." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). Therefore, " 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which are related to the purpose of the particular law in conflict.' " *Id.* (citation omitted). "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort...." *Id.* Further, under New York's approach, "the relative interests of the domicile and locus jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case." *Id.*

> Thus, when the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort "will usually have a predominant, if not exclusive, concern" ... because the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interest of the common-domicile jurisdiction.... Conversely, when the jurisdictions' conflicting rules relate to allocating losses that result from admittedly tortious conduct ..., rules such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit, considerations of the State's admonitory interest and party reliance are less important.

*Id.* 491 N.Y.S.2d at 95–96, 480 N.E.2d at 684–85.

Upon applying both standards, I hold that New Jersey tort law governs the Customers' actions. Although the Customers reside in New York, the Banks are located in New Jersey, as are the residences of Payroll [11] and Felzenberg. (Beth Israel Compl. ¶¶ 1, 12–29; Goldman Compl. ¶¶ 1–4; NYCTA Compl. ¶¶ 1–3; Copytone Compl. ¶¶ 10–15.) Similarly, all of the complained-of dealings

---

11. The fact that NYCTA complains of Payroll Express Corp. of New York (NYCTA Compl. ¶ 6)

does not alter my ultimate conclusion that New Jersey tort law governs the Customers' actions.

between the Banks and Payroll took place in New Jersey, and the Banks' allegedly wrongful setoff—the *sine qua non* of the Customers' claims—took place in New Jersey. Finally, both New York and New Jersey have adopted Uniform Commercial Code § 4–102(b), which provides that for the purpose of determining liability of a branch or separate office of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection, the "liability is governed by the law of the place where the branch or separate office is located." N.J.U.C.C. § 4–102(b); N.Y.U.C.C. § 4–102(2). This provision further supports the conclusion that under the choice of law principles of both New Jersey and New York, New Jersey's conduct-regulating tort law should govern the Customers' actions.

## IV. *Customers' Claims*

Turning to the merits of the Customers' claims, I find, upon accepting their well-pleaded allegations as true and drawing all inferences in their favor, that they have failed to state claims for relief for negligence; aiding and abetting Payroll's wrongful conduct; breach of fiduciary duty; fraud; equitable fraud; and conspiracy to conceal check-kiting. The Customers' conversion claims are dismissed in part and stayed in part, and their claims for conspiracy to convert; constructive trust; unjust enrichment; monies had and received; and restitution of payments by mistake are stayed.

### A. *Negligence*

■ The Customers' negligence claims seek to hold the Banks liable for the flexible terms which the Banks accorded Payroll, such as permitting Payroll's accounts to become overdrawn and extending substantial credit to Payroll, which allowed Payroll to engage in its wrongful schemes without the Customers' awareness. A plaintiff seeking to recover for negligence must establish: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) proximate causation, and (4) a foreseeable resulting injury. *Anderson v. Sammy Redd and Assocs.*, 278 N.J.Super. 50, 650 A.2d 376, 379 (App.Div. 1994), *certif. denied*, 139 N.J. 441, 655 A.2d

444 (1995). Because the Banks do not owe the Customers a duty of reasonable care which may give rise to liability in negligence, the Banks' motions to dismiss the negligence claims against them are granted.

■ "It is not … enough to ground liability in negligence to show that a defendant did not act with reasonable care, and that this carelessness caused injury. Plaintiff must also show that defendant owes him a duty of care." *Weinberg v. Dinger*, 106 N.J. 469, 524 A.2d 366, 374 (1987). As the New Jersey Supreme Court stated in *Kelly:*

> In most cases the justice of imposing such a duty is so clear that the cause of action in negligence is assumed to exist simply on the basis of the actor's creation of an unreasonable risk of foreseeable harm resulting in injury. In fact, however, more is needed, "more" being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care.

*Kelly v. Gwinnell*, 96 N.J. 538, 476 A.2d 1219, 1222 (1984), *quoted by Weinberg*, 524 A.2d at 374. Whether a duty exists, in other words, " 'is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Kelly*, 476 A.2d at 1222 (quoting *Goldberg v. Housing Auth. of Newark*, 38 N.J. 578, 186 A.2d 291 (1962)); *accord Giantonnio v. Taccard*, 291 N.J.Super. 31, 676 A.2d 1110, 1114 (App.Div.1996). "Further, the issue of whether a duty exists to support a negligence claim is an issue of law for the court to decide." *Woods Corporate Assocs. v. Signet Star Holdings, Inc.*, 910 F.Supp. 1019, 1033 (D.N.J.1995).

New Jersey courts have decided in situations strikingly similar to that in the instant action that banks do not owe a duty to a plaintiff—even if the plaintiff is one of the bank's depositors—to prevent, warn, or otherwise protect the plaintiff from the malfeasance of a third party with whom the bank transacted business. In *Turf Club*, the plaintiff company ("Turf Club") maintained a business relationship with Eugene Zeek ("Zeek") whereby Turf Club provided Zeek with its check cashing services. *Pennsylva-*

*nia Nat'l Turf Club, Inc. v. Bank of West Jersey,* 158 N.J.Super. 196, 385 A.2d 932, 934 (App.Div.), *certif. denied,* 77 N.J. 506, 391 A.2d 520 (1978). Zeek was a customer of defendant Bank of West Jersey ("BWJ"). *Id.* Due to the potentially profitable relationship with Zeek, BWJ agreed to an unusual arrangement with Zeek which allowed him to incur and then cover overdrafts from checks drawn on the account. *Id.* Zeek, however, soon stopped covering the overdrafts and BWJ stopped honoring his checks, including those cashed by Turf Club. *Id.* The trial court entered judgment for Turf Club, "holding that the bank's pattern of conduct in handling the Zeek account throughout its existence constituted a negligent failure to exercise reasonable care which, in turn, permitted Zeek to carry out his scheme to the damage of the Turf Club," and that "the bank's practices constituted bad faith." *Id.* 385 A.2d at 935.

The Appellate Division, however, "conclude[d] that the trial judge erred and that the bank cannot be held liable to Turf Club under any legal theory regardless of the patently unbusinesslike deviations from good banking practices in the handling of the Zeek account." *Id.* After citing the "fundamental requisite for tort liability" that the defendant owe a duty to the defendant, the Court held that BWJ owed no duty to Turf Club. *Id.* at 936. "In the absence of evidence of any agreement, undertaking or contact" between BWJ and Turf Club "from which any special duty can be derived, the improper handling of the Zeek account cannot in the abstract serve as a stepping stone for liability to plaintiff." *Id.* Instead, Turf Club "was the party who assumed the risk associated with" allowing Zeek to cash substantial checks with it on a daily basis. *Id.* Turf Club, whose losses were "brought about solely through [its] relationship with and reliance upon the trustworthiness of Zeek, . . . cannot recoup by attempting to shift responsibility to the bank which had no relationship with it." *Id.*

In *Globe Motor,* the Court addressed "the liability of a bank to its *depositor* with respect to approximately $1.5 million embezzled by the depositor's employee." *Globe Motor Car Co. v. First Fidelity Bank, N.A.,* 273 N.J.Super. 388, 641 A.2d 1136, 1137 (Law Div.1993) (emphasis added), *aff'd,* 291 N.J.Super. 428, 677 A.2d 794 (App.Div.1996). Plaintiff Globe Motor Car Company ("Globe") entered into an agreement with defendant First Fidelity Bank, N.A. ("First Fidelity") whereby First Fidelity made loans to Globe to permit Globe to acquire new and used motor vehicles for sale or lease. *Id.* John Gallo ("Gallo"), Globe's office manager who handled most of Globe's daily finances, embezzled from Globe from 1987 until 1990. *Id.* 641 A.2d at 1138. Globe sued First Fidelity alleging that it was negligent in failing to detect or prevent Gallo's criminal spree. *Id.*

The Court rejected Globe's argument. It held that

[i]mposing such a duty on a depositor bank would be unreasonable and untenable. Indeed, it would be foolhardy to expect a bank to supervise its depositor's employees, manage its financial planning and oversee its business activities. . . . Thus, imposing a duty on a bank that would obligate it to be responsible for its depositor's financial affairs would be impractical as a matter of public policy. As one California court stated, "[p]ublic policy does not impose upon the Bank absolute liability for the hardships which may befall the business ventures it finances."

*Id.* at 1139 (citation omitted). Instead, "depositors such as Globe are better suited than their lending bank to manage their own affairs, hire and supervise their own employees, keep their own records, hire their own auditors and detect and deal with corporate theft." *Id.* "In fact, even if the bank was aware of Gallo's defalcation, the bank had no duty 'to disclose matters of which the other party has actual or constructive knowledge or as to which the information or means of acquiring information of the two parties is equal.'" *Id.* (citation omitted). The Court concluded that "[a]bsent a contractual duty, a bank has no obligation to manage, supervise, control or monitor the financial activity of its debtor-depositor and is not liable to its depositor in negligence for failing to uncover a major theft." *Id.*

I find that New Jersey's common law of negligence does not impose a duty on the Banks upon which the Customers may hinge their negligence claims. The allegations in the Customers' complaints do not support the existence of any agreement, undertaking, or contract between the Customers and the Banks which would give rise to a special duty on behalf of the Banks to take measures to protect the Customers from Payroll's wrongdoing. The Banks allegedly "patently unbusinesslike deviations from good banking practices" are not sufficient to give rise to such a duty, *Turf Club*, 385 A.2d at 935, nor is the fact that some of the Customers may be patrons of the Banks in situations unrelated to the instant action, *Globe Motor*, 641 A.2d at 1137, nor is the fact that the Banks may have been aware of Payroll's diversion of the Customers' funds for purposes other than cashing paychecks, for the Customers' ability to monitor Payroll's business dealings and activities by requiring Payroll to submit financial records and by hiring auditors was equal to that of the Banks, *id.* at 1139; *see also infra* part IV.D. (holding that the Banks owe no duty of disclosure to the Customers).

Accordingly, absent a duty owed by the Banks which may be breached, the Customers' negligence claims are dismissed. *See Riggs v. Schappell*, 939 F.Supp. 321, 328–30 (D.N.J.1996) (holding that, under New Jersey law, a clearing broker owed no duty to customers of a primary broker who were defrauded through the primary broker's investment of their retirement funds in speculative securities).

### B. *Aiding and Abetting*

The Customers also allege that the Banks aided and abetted Payroll's conversion of their property, Payroll's breach of its fiduciary duty to the Customers, and Payroll's fraud. New Jersey adheres to Section 876(b) of the Restatement of Torts for the civil standard of aiding and abetting liability. *Judson v. Peoples Bank and Trust Co.*, 25 N.J. 17, 134 A.2d 761, 767 (1957); *see Resolution Trust Corp. v. Spagnoli*, 811 F.Supp. 1005, 1014 (D.N.J.1993); *Shulton, Inc. v. Optel Corp.*, No. 85–2925, 1986 WL 15617, at *20 (D.N.J. Sept. 29, 1986) (both citing *Judson* for this proposition). Thus, the elements required for aiding and abetting liability are: "(1) that an independent wrong exist; (2) that the aider or abettor know of the wrong's existence; and (3) that substantial assistance be given to effecting that wrong." *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 162–63 (3d Cir.1973) (applying the standard set forth in Restatement (Second) of Torts § 876(b)), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Assuming, *arguendo*, that the first two elements are satisfied, I find that the Customers' allegations fail to establish that the Banks substantially assisted Payroll's wrongful conduct.

As the Court discussed in *Landy*,

[t]he Restatement suggests that in determining if the assistance is substantial enough to make an individual liable for the act of another, the relevant factors are: (1) the amount of assistance given by the defendant; (2) his presence or absence at the time of the tort; (3) his relation to the other person; and (4) his state of mind.

*Id.* at 163; *accord* Restatement (Second) of Torts § 876 cmt. d [hereinafter Restatement]. The Restatement also illustrates when the assistance or participation of a defendant is so slight that the defendant is not liable for the act of another:

A is employed by B to carry messages to B's workmen. B directs A to tell B's workmen to tear down a fence that B believes to be on his own land but that in fact, as A knows, is on the land of C. A delivers the message and the workmen tear down the fence. Since A was a servant used merely as a means of communication, his assistance is so slight that he is not liable to C.

Restatement § 876 cmt. d, illus. 9. As this illustration demonstrates, the mere fact that a defendant's assistance was necessary for the primary wrong is not sufficient to render the assistance substantial. *Landy*, 486 F.2d at 163.

Finally, assistance is less likely to be deemed substantial if the defendant was motivated by a lawful goal, such as the generation of commissions, independent of

that which motivated the primary wrongdoer. *Id.* Instead of harboring such lawful motivations, " 'it is necessary that a defendant "in some sort associate himself with the [tortious] venture, that he participate in it as something that he wished to bring about, that he seek by his action to make it succeed." ' " *Id.* (citations omitted) (relying on the criminal concept of aiding and abetting to "harmonize[ ] with the criterion of 'state of mind' set forth in the Restatement for civil liability.").

■ The Customers' allegations of the Banks' substantial assistance are, in essence, a recharacterization of the same allegations upon which they rely for their negligence claims. They complain that the Banks, in order to generate fees from Payroll (Beth Israel Compl. ¶ 6; Copytone Compl. ¶¶ 36–37, 106), provided Payroll with their banking services on flexible terms, and that this assistance allowed Payroll to convert the Customers' property, breach its alleged fiduciary duty to the Customers, and commit fraud upon the Customers. These allegations are not sufficient to show that the Banks substantially assisted in Payroll's wrongdoing. Accordingly, the Customers' aiding and abetting claims are dismissed.

### C. *Breach of Fiduciary Duty*

■ Next, the Customers allege that the Banks breached their fiduciary duty. To prevail on these claims, the Customers must establish: (1) a fiduciary duty owed by the Banks to them; (2) a breach of this duty; (3) causation; and (4) injury to the Customers. *In re ORFA Sec. Litig.*, 654 F.Supp. 1449, 1457 (D.N.J.1987). According to the Customers, the Banks' fiduciary duty arose from the Banks' awareness of the special purpose for which the deposits into Payroll's accounts were made (*i.e.*, solely to cash the Customers' employees' payroll checks). I disagree that this awareness gives rise to a fiduciary duty and, accordingly, these claims are dismissed.

As the Supreme Court recognized almost a century ago,

> [i]t cannot be doubted that, except under special circumstances, or where there is a statute to the contrary, a deposit of money upon general account with a bank creates the relation of debtor and creditor. The money deposited becomes part of the general fund of the bank, to be dealt with by it as other moneys, to be lent to customers, and parted with at the will of the bank, and the right of the depositor is to have this debt repaid in whole or in part by honoring checks drawn against the deposits. It creates an ordinary debt, not a privilege or right of a fiduciary character.

*Massey,* 192 U.S. at 145, 24 S.Ct. at 200–01; *see Strumpf,* —— U.S. at ——, 116 S.Ct. at 290 ("[A] bank account ... consists of nothing more or less than a promise to pay, from the bank to the depositor ... and petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercise of control over it, but merely a refusal to perform its promise."); *Pagano v. United Jersey Bank,* 143 N.J. 220, 670 A.2d 509, 515 (1996) ("When a bank accepts a deposit from a depositor for either a checking or savings account, a creditor-debtor relationship typically is established" between the bank and depositor.).

■ Circumstances do exist, however, in which a bank owes a fiduciary duty. These circumstances rest on the distinction between general deposits and special deposits. In a general deposit, " 'the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person.' " *Kronisch v. Howard Sav. Inst.,* 161 N.J.Super. 592, 392 A.2d 178, 180 (App. Div.1978) (per curiam) (citation omitted). These deposits give rise to a debt. *Id.* In a special deposit, " 'the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person.' " *Id.* (citation omitted). These deposits give rise to a trust. *Id.* "[T]here is a presumption that a deposit in a bank is general." *Id.* 392 A.2d at 183. Because " '[e]armarking and setting aside cash or credit involve delay and additional expense[,] [c]lear proof should be required to prove that [a bank] undertook a trust ... rather than merely a contract obligation.' " *Id.* at 181.

A subset of the general deposit is a general deposit for a special purpose. " 'As in the case of the usual general deposit, the bank is under a personal liability and does not hold the money in trust.' " *Id.* at 184 (citation omitted). Unlike special deposits, "in a general deposit for a special purpose the depositor has no intention to segregate the funds and there is no prohibition against the bank using the funds for its own purposes and thereafter paying the debt from its general funds." *Id.* at 185. As this discussion indicates, "a deposit does not become 'special' simply because the depositor wishes to have the bank devote the deposited funds to a special purpose." *Id.* at 183. Instead, " [t]he mere fact that a deposit is made for a special purpose is not a sufficient reason, unless there is an understanding that the money deposited should not be used as a part of the general assets of the bank.' " *Kronisch v. Howard Sav. Inst.*, 154 N.J.Super. 576, 382 A.2d 64, 73 (Ch.Div.1977) (citation omitted), *aff'd on this ground, rev'd on other grounds*, 161 N.J.Super. 592, 392 A.2d 178. Further, the fact that the money deposited is to be paid to a third party on the happening of a designated event with the depositor having no right to withdraw the money in the meantime—a deposit in escrow—is not dispositive of this issue. *Kronisch*, 392 A.2d at 179–80, 184. Instead, "[s]egregation of funds is one of the prime indicators of the existence of a trust." *Kronisch*, 382 A.2d at 72.

In the instant action, the Customers' allegations support only the existence of a debt (which implicates contractual obligations), not the existence of a trust (which implicates fiduciary duties). The complaints are devoid of allegations giving rise to an inference that the Banks incurred the obligation to segregate the deposits into Payroll's accounts from the Banks' general assets. Although the Customers may have had independent agreements with Payroll as to the segregation of the deposits, no such agreements are pleaded with respect to either the Customers and the Banks or Payroll and the Banks. Therefore, the deposits herein gave rise to a mere debt on behalf of the Banks, not a trust which may implicate a fiduciary duty owed to the Customers, and these claims must be dismissed. *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir.1988) ("[C]reditor-debtor relationships ... rarely are found to give rise to a fiduciary duty.").[12]

### D. *Fraud and Equitable Fraud*

The Customers also seek recovery under the theories of fraud and equitable fraud. Their fraud claims require them to prove that the Banks made "(1) a material misrepresentation of present or past fact (2) with knowledge of its falsity (3) with the intention that the [Customers] rely thereon (4) and which resulted in reasonable reliance by [the Customers]." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir.

12. Although the Customers also rely on *Morrison Steel Co. v. Gurtman*, 113 N.J.Super. 474, 274 A.2d 306 (App.Div.1971) to argue for a fiduciary duty, I find this reliance to be misplaced. As discussed above in the context of Pereira's preference actions, *Morrison Steel* discussed a limitation on a bank's setoff rights based on the bank's knowledge or notice that a third person has an interest in the deposits at issue. *See supra* p. 661; *see also Kanter v. Security Trust Co. of Paterson*, 110 N.J.L. 361, 165 A. 430, 431 (1933) (holding that a bank of a deceased depositor had no right to offset against a debt owed by the deceased funds deposited by the executrix in an account which she opened in that capacity for the benefit of all of the deceased's creditors); *Hudson United Bank*, 373 A.2d at 440 ("Funds deposited in a bank for a special purpose which is made known to the bank or under a special agreement cannot be set off by the bank against a debt due to it from the depositor.").

Unlike the Customers, I do not interpret *Morrison Steel* or the other cases discussing this limitation on banks' setoff rights as imposing fiduciary duties on banks. While some of these cases use the term "special deposits," *e.g., Hudson United Bank*, 373 A.2d at 440 ("[T]he weight of the authority on the issue of set-offs by banks recognizes a distinction between general deposits and *special deposits.*") (emphasis added), their analysis is confined to the propriety of setoffs, not whether a particular deposit gives rise to a debt or a trust. Accordingly, I find that these cases do not alter the principle that the prime indicator of a trust is segregation of funds. Because the Customers' allegations do not permit the inference of an undertaking by the Banks to segregate the deposits in Payroll's accounts from the Banks' general assets, I find that a mere debt was created by these deposits and the Banks did not owe the Customers a fiduciary duty.

1993) (citing *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521, 524 (1981)); *accord United Jersey Bank v. Wolosoff*, 196 N.J.Super. 553, 483 A.2d 821, 826 (App.Div. 1984); *Grow Farms Corp. v. National State Bank*, 167 N.J.Super. 102, 400 A.2d 535, 537 (Law Div.1979). As for equitable fraud, the Customers "need not demonstrate scienter, ... but must establish the other elements of fraud by clear and convincing evidence." *Lightning Lube*, 4 F.3d at 1183.[13]

■■■ The Customers' fraud and equitable fraud claims rely on the alleged duty of the Banks to disclose to them that Payroll's accounts were overdrawn, that Payroll was engaged in check-kiting, that Payroll was diverting their funds, and that the Banks had frozen Payroll's accounts.[14] "[W]here a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Id.* at 1185 (citations omitted). A special relationship may arise in any of three types of relationships:

(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties.

*Id.* "[D]etached business relationship[s] [do] not fall into any of these categories." *Id.* (characterizing the relationship between a quick-lube franchisor and its motor oil supplier as "a detached business relationship"); *see Turf Club*, 385 A.2d at 936 ("[T]he bank owed no general duty to Turf Club by way of warning or other notice, merely because the latter undertook to cash its depositor's

checks, which turned out to be dishonored for insufficient funds.").

■■■ I find that the Banks owed no duty of disclosure to the Customers. The Customers' allegations are insufficient to show either that the Banks spoke in "half-truths," thereby giving rise to a duty to make additional disclosures to make the previous statements completely truthful, or that the Banks and Customers were involved in a special relationship. As discussed above, the Banks owed no fiduciary duty to the Customers which may give rise to a special relationship. In fact, the Banks' relationships with most of the Customers did not even rise to the level of a detached business relationship; rather, they maintained no relationship at all. Finally, even as to those Customers who may have been patrons of the Banks in other contexts, it is mere fortuity that these Customers happened to have accounts with the same banks as Payroll. Their dealings with the Banks were completely independent of the facts and circumstances of this action and will not suffice to create a duty of the Banks to make disclosures regarding the transactions about which the Customers complain. Consequently, the Banks' motions to dismiss the Customers' fraud and equitable fraud claims are granted.

### E. *Conspiracy to Conceal Payroll's Check–Kiting*

■■■ Copytone also alleges that "[o]n or about May 22, 1992 or over the Memorial Day weekend, but believed to be closer to May 26, 1992, Banks agreed and conspired ... to conceal the kiting scheme in order to share in the monies in [Payroll's] accounts and being deposited by [Payroll's] customers." (Copytone Compl. ¶ 68.) Unlike in a criminal conspiracy, where the conspiracy is itself an independent wrong, "[t]he gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong

---

**13.** Scienter consists of the elements of knowledge of falsity and intention to induce reliance. *Jewish Ctr.*, 432 A.2d at 525.

**14.** Although Copytone also alleges that the Banks made affirmative misrepresentations, these alleged statements involve the Banks' informing some of the Customers that Payroll's accounts

were frozen and no longer open. (Copytone Compl. ¶ 72.) These statements, therefore, were true. Further, the Banks made these statements *after* the Customers advanced their money to Payroll, thereby undermining the Customers' contention that they continued to advance funds to Payroll based on the Banks' statements.

which, absent the conspiracy, would give a right of action." *Board of Educ. v. Hoek,* 38 N.J. 213, 183 A.2d 633, 646 (1962). Proof of the conspiracy merely "makes the conspirators jointly liable for the wrong and resulting damages." *Id.* Because the Banks owed no duty of disclosure to the Customers, *see supra* pp. 673–75, the Customers may not maintain a conspiracy claim based on the Banks' failure to disclose the check-kiting. This claim, therefore, is dismissed.

### F. *Conversion*

 The Customers' next claim is for conversion, which is "the exercise of any act of dominion in denial of another's title to the chattels, or inconsistent with such title." *Mueller v. Technical Devices Corp.,* 8 N.J. 201, 84 A.2d 620, 623 (1951). As this definition indicates, "[t]he essential elements of the common-law action in conversion are: [1] that the property and right to immediate possession thereof belong to the plaintiff; and [2] the wrongful act of interference with that right by the defendant." *First Nat. Bank of Bloomingdale v. North Jersey Trust Co.,* 18 N.J.Misc. 449, 14 A.2d 765, 767 (Sup. Ct.1940); *accord Life Ins. Co. of Va. v. Snyder,* 141 N.J.Super. 539, 358 A.2d 859, 862 (Dist.Ct.1976) ("The elements of conversion are lacking [if the] [p]laintiff does not have the right to immediate possession of the [property]."). Thus,

> "[t]o constitute a conversion of goods there must be some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel."
>
> ... "Less than this would constitute trespass, but not a conversion, so long as the character of the chattels remained unchanged."

*Mueller,* 84 A.2d at 623 (citations omitted).

 " '[I]t is not essential to conversion,' " however, " 'that the motive or intent with which the act was committed should be wrongful, or willful or corrupt, although, as in actions for damages for torts generally, ... factors of this character may be taken into consideration in determining whether exemplary damages shall be allowed.' " *McGlynn v. Schultz,* 90 N.J.Super. 505, 218 A.2d 408, 419–20 (Ch. Div.1966) (citation omitted), *aff'd,* 95 N.J.Super. 412, 231 A.2d 386 (App.Div.), *certif. denied,* 50 N.J. 409, 235 A.2d 901 (1967). Accordingly, "[t]he elements of good faith, intent or negligence do not play a part in an action for damages in conversion." *Id.* 218 A.2d at 419; *accord Chemical Bank v. Miller Yacht Sales,* 173 N.J.Super. 90, 413 A.2d 619, 623 (App.Div. 1980). Instead, " '[i]t is the effect of the act which constitutes the conversion.' " *Charles Bloom & Co. v. Echo Jewelers,* 279 N.J.Super. 372, 652 A.2d 1238, 1242 (App.Div.1995) (citation omitted).

 The Customers' conversion claims complain of three particular acts of the Banks: accepting the deposits of wire transfers, endorsed paychecks, checks drawn on NYCTA's Chemical Bank account, and excess cash into Payroll's accounts; not returning certain deposits when the Customers so requested; and freezing Payroll's account and using the money therein to offset debt owed by Payroll to the Banks because of Payroll's check-kiting. The first two acts fail to constitute conversion and the third act, which will be discussed *infra* part IV.G., is stayed.

With respect to the Banks' acceptance of deposits into Payroll's accounts, some were made by the Customers while others were made by Payroll. As for those made by the Customers (*i.e.,* wire transfers into Payroll's UJB account), the alleged facts do not permit the inference that UJB acted in a manner inconsistent with or in repudiation of the Customers' rights in the deposits. UJB did exactly as the Customers' payment orders instructed. This is not a case where, for example, UJB deposited funds into an account other than the one directed by the payment order. Further, "[i]t is well settled that where possession of chattels is lawfully acquired, a demand therefor and refusal to deliver is generally necessary before an action in trover and conversion will accrue." *Mueller,* 84 A.2d at 623. By wire transferring advances into Payroll's UJB account, the Customers obviously could not be said to have simultaneously made a demand for the

return of these advances. In the end, this facet of the Customers' conversion claims is no more than an attempt to argue that the Banks owed the Customers a duty to disclose their alleged knowledge about Payroll's wrongdoing and the frozen status of Payroll's accounts. As discussed above in the context of fraud and equitable fraud, however, the Banks did not owe the Customers such a duty. Accordingly, UJB's mere acceptance of wire transfers into Payroll's account may not give rise to an action in conversion.

As for wrongful deposits by Payroll into its accounts at the Banks of endorsed paychecks,[15] checks drawn on NYCTA's Chemical Bank account, and excess cash, the alleged facts show only that Payroll, not the Banks, exercised dominion over the Customers' property for the purposes of conversion. The Banks merely became temporary agents of Payroll—during the check collection process, N.J.U.C.C. § 4–201—or debtors of Payroll—upon the clearance of the checks or upon the deposits of cash. If this conduct were sufficient to constitute conversion, then any bank which accepted for deposit checks and cash which its depositor converted automatically would be saddled with liability based on its depositors' wrongdoing. Having already found that the mere provision by the Banks of their business services to Payroll does not suffice for liability under an aiding

and abetting theory, however, I similarly find that their acceptance of Payroll's deposits does not provide a basis to hold the Banks liable in conversion as a primary tortfeasor.[16]

This reasoning also mandates that the Banks' failure to return the Customers' deposits upon their demands is not sufficient to hold the Banks liable for conversion. The allegations do not show that anyone other than Payroll maintained the ability to withdraw funds from its accounts at UJB and NatWest. The Banks, therefore, would be in violation of their contractual duties to Payroll if they allowed third parties to make debits to Payroll's accounts. Cf. *Mueller*, 84 A.2d at 625 ("A failure to surrender goods constitutes a conversion only if the demand is made upon a person obligated to surrender the goods, or if made upon an agent or employee[,] such power must be within the scope of his agency or employment."). Accordingly, Payroll, not the Banks, exercised dominion over the Customers' advances at this stage and the Customers' conversion claims based on the Banks' refusal to return previously deposited funds are dismissed.

### G. *Setoff Claims*

The remaining facet of the Customers' conversion claims and their claims for conspiracy to convert,[17] constructive trust,[18] unjust enrichment,[19] monies had and

---

**15.** Recall, however, that the agreement between Hebrew Home and Payroll required Payroll to deposit endorsed paychecks into Payroll's UJB account. (Beth Israel Compl. ¶ 34.)

**16.** This is not a case involving allegations that the Banks accepted forged or otherwise improper instruments for deposit. *See, e.g., Mandelbaum v. P & D Printing Corp.*, 279 N.J.Super. 427, 652 A.2d 1266, 1268 (App.Div.1995) ("Payment of a draft or check with a missing endorsement is the equivalent of payment of a forged instrument and constitutes conversion against the non-signing payee."); *Sommers v. McKinney*, 287 N.J.Super. 1, 670 A.2d 99, 106 (App.Div. 1996) (holding that "[t]he payee [of a check] may assert a cause of action for conversion against a drawee or payor bank" based on a missing endorsement on a check).

**17.** Copytone alleges that the Banks agreed around May 22, 1992 "to participate in a conversion of customers' monies ... in order to share in the monies in [Payroll's] accounts and being deposited by [Payroll's] customers." (Copytone Compl. ¶ 68.)

**18.** A claim of constructive trust requires proof of (1) a wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, (2) a transfer of property, and (3) retention of the property that would result in unjust enrichment of the person retaining it. *D'Ippolito v. Castoro*, 51 N.J. 584, 242 A.2d 617, 619 (1968) (refraining from addressing whether a constructive trust may arise absent any wrongdoing on the part of the alleged trustee, but finding such wrongful conduct in that case); *see Kronisch*, 392 A.2d at 185 (holding that there must be clear proof of a wrongful act).

"[T]he concept of a constructive trust " 'is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." ' " *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 605 A.2d 681, 691 (citations omitted), *cert. denied*, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). In the words of Judge Cardozo, a constructive trust is "the formula through which the conscience of equity finds expression. When property has been acquired in

received,[20] and restitution of payments by mistake [21] (the "Customers' setoff claims") all seek recovery from the Banks based upon their setoff of funds in Payroll's accounts. Because the issues raised by these claims also have been raised in the context of Pereira's preference claims and the Bankruptcy Code preempts conflicting state law claims, the Customers' setoff claims are stayed pending the resolution of Pereira's preference actions against the Banks.

such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919), *quoted by Delaware Truck Sales, Inc. v. Wilson*, 131 N.J. 20, 618 A.2d 303, 315 (1993) (Pollack and Stein, J.J., concurring).

**19.** The Customers' claims for unjust enrichment, more properly referred to as claims for quasi-contractual liability, *National Amusements, Inc. v. New Jersey Turnpike Auth.*, 261 N.J.Super. 468, 619 A.2d 262, 267 (Law Div.1992) ("Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability.") *aff'd*, 275 N.J.Super. 134, 645 A.2d 1194 (App.Div.), *certif. denied*, 138 N.J. 269, 649 A.2d 1288 (1994), require proof that (1) the Banks received a benefit, and (2) an injustice would result if the Banks retained the benefit without paying for it, *Wanaque Borough Sewerage Auth. v. Township of West Milford*, 144 N.J. 564, 677 A.2d 747, 753 (1996); *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 641 A.2d 519, 526 (1994); *Mayor and Council of the Borough of Rockaway v. Klockner & Klockner*, 811 F.Supp. 1039, 1058 (D.N.J.1993).

As with other actions based on quasi-contractual liability, it "rests on the equitable principle that a person shall not be allowed to enrich himself at the expense of another." *National Amusements*, 619 A.2d at 267; *see VRG Corp.*, 641 A.2d at 526 ("The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."); *Associates Commercial Corp. v. Wallia*, 211 N.J.Super. 231, 511 A.2d 709, 716 (App.Div.1986) (" 'The key words are enrich and unjustly.' ") (citation omitted); *Kronisch*, 392 A.2d at 185 (holding that unjust enrichment "is predicated upon a finding that one party has taken unconscionable advantage over another."). "Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law." *National Amusements*, 619 A.2d at 267.

**20.** As the New York Court of Appeals has stated:

"Whenever the federal government has the authority to regulate a given area, Congress may exercise that power so as to preclude states from asserting authority over the same subject matter," *Association of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 607 (2d Cir.1996), for the Supremacy Clause provides that "the Laws of the United States ... shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2. "As early as *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23

A cause of action for money had and received is one of quasi-contract or of contract implied-in-law.... As this Court has explained, the law recognizes such a cause of action in the absence of an agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another.... It allows [a] plaintiff to recover money which has come into the hands of the defendant impressed with a species of trust ... because under the circumstances it is against good conscience for the defendant to keep the money.... The action depends upon equitable principles in the sense that broad considerations of right, justice and morality apply to it, but it has long been considered an action at law....
*Board of Educ. v. Rettaliata*, 78 N.Y.2d 128, 572 N.Y.S.2d 885, 888, 576 N.E.2d 716, 719 (1991) (citations and internal quotation marks omitted). (Although it appears that New Jersey does recognize this legal theory, *see American Ins. Co. v. Fidelity Bank and Trust Co.*, 244 N.J.Super. 600, 583 A.2d 361, 363 (App.Div.1990); *Brighton, Inc. v. Colonial First Nat'l Bank*, 422 A.2d 433, 438 (App.Div.1980), *aff'd*, 86 N.J. 259, 430 A.2d 902 (1981), I am aware of no New Jersey case articulating its requirements. Therefore, I have relied on New York law in this regard.)

**21.** This doctrine has been concisely stated as follows:

It is a general rule that a payment of money under a mistake of fact may be recovered, provided that such recovery will not prejudice the payee. This rule is grounded upon considerations of equity and fair dealing. It is considered unjust enrichment to permit a recipient to retain money paid because of a mistake, unless the circumstances are such that it would be inequitable to require its return.... This is so notwithstanding that the mistake is unilateral and a consequence of the payor's negligence, or that the payee acted in good faith.... A person who receives a voluntary benefit is liable to make restitution if the circumstances of its receipt or retention are such that, as between the two persons, it would be unjust for the recipient to retain the benefit.
*Winslow, Cohu & Stetson, Inc. v. Skowronek*, 136 N.J.Super. 97, 344 A.2d 350, 354 (Law Div. 1975).

(1824), Chief Justice Marshall stated the governing principle—that 'acts of the State Legislatures ... [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution,' are invalid under the Supremacy Clause." *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971).

■■■ There can be no doubt that Congress has the authority to regulate disputes arising in the context of bankruptcies. *See* U.S. Const., art. I, § 8, cl. 4 (providing that Congress shall have the power "To establish ... uniform Laws on the subject of Bankruptcies throughout the United States"); *International Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 110, 73 L.Ed. 318 (1929) ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount."). The issue at hand, therefore, is whether Congress intended to exercise its constitutionally delegated authority to set aside the Customers' setoff claims. *Barnett Bank of Marion County, N.A. v. Nelson,* ─── U.S. ───, ───, 116 S.Ct. 1103, 1107, 134 L.Ed.2d 237 (1996).

■■■ "Such preemption may be express or implied." *Association of Int'l Auto. Mfrs.,* 84 F.3d at 607. "Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field." *Id.* "Even where there is no express statutory statement ousting state law from a given area, there may be implied preemption." *Id.* "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, ... or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is both impossible for a private party to comply with both state and federal requirements, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Freightliner Corp. v. Myrick,* ─── U.S. ───, ───, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995)); *accord Barnett Bank,* ─── U.S. at ───, 116 S.Ct. at 1108.

Courts have found a variety of state statutory laws to be preempted by the Bankruptcy Code. *See, e.g., Perez,* 402 U.S. at 656, 91 S.Ct. at 1714–15 (holding that a state motor vehicle safety law which suspended licenses and registrations for nonpayment of judgments arising from motor vehicle accident lawsuits conflicted with the Bankruptcy Act's provision that receipt of discharge in bankruptcy fully discharges all but certain specified judgments); *Pinkus,* 278 U.S. at 266, 49 S.Ct. at 110–11 (holding that a state statute which governed "the distribution of property of insolvents for the payment of their debts and provid[ed] for their discharge" was preempted under the doctrine of field preemption); *In re Hecht,* 41 B.R. 701, 706 (Bankr.S.D.N.Y.1984) (holding that Bankruptcy Code Section 553(b)—the improvement in position provision—had a preemptive effect over New York commercial law regarding the maturity of notes). *But see, e.g., Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 507 and n. 9, 106 S.Ct. 755, 762–63 and n. 9, 88 L.Ed.2d 859 (1986) (holding that the Bankruptcy Code did not preempt a state law imposing conditions on a bankruptcy trustee's abandonment of the estate's property when the statute was reasonably designed to protect the public health or safety from imminent and identified hazards).

Courts also have found such preemption in the context of state common law claims. *See, e.g., MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 916 (9th Cir.1996) (holding that a malicious prosecution action by a Chapter 11 debtor against a creditor based on the creditor's filing of claims in the Chapter 11 proceeding was "completely preempted by the structure and purpose of the Bankruptcy Code"); *Koffman v. Osteoimplant Technology, Inc.,* 182 B.R. 115, 125 (D.Md. 1995) (holding that a Chapter 7 debtor's state tort claims for abuse of process and malicious prosecution due to the filing of the involuntary bankruptcy proceedings against the debtor were preempted by the Bankruptcy Code because these claims "threaten[ed] to erode the exclusive federal authority in this area," and "threaten[ed] the uniformity of federal bankruptcy law"); *Sarno v. Thermen,*

239 Ill.App.3d 1034, 180 Ill.Dec. 889, 896, 608 N.E.2d 11, 18 (1992) (holding that a Chapter 7 debtor's state law conspiracy claim against the creditor who filed the involuntary bankruptcy petition against the debtor was preempted by the Bankruptcy Code).

In the instant action, I find that the Customers' setoff claims potentially stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as embodied by Sections 547(b) and 553 of the Bankruptcy Code. This conclusion is mandated by the fact that each of the contentions underlying the Customers' setoff claims falls squarely within the ambit of Sections 547(b) and 553, both of which lie at the core of the Bankruptcy Code.

The Customers initially contend that the funds setoff by the Banks are their property, not that of Payroll. The issue of whether the funds are the Customers' property, Payroll's property, or some combination thereof, however, is central to the application of Section 547(b), which, in turn, is an integral part of the Bankruptcy Code's larger concern with promoting "[e]quality of distribution among creditors." *Begier,* 496 U.S. at 58, 110 S.Ct. at 2262. It addresses this concern by "preserv[ing] the property includable within the bankruptcy estate—the property available for distribution to creditors." *Id.* Further, its application requires the trustee to show that the allegedly preferential transfers involved "an interest of the debtor in property." 11 U.S.C. § 547(b). Accordingly, Pereira's preference actions already encompass this issue raised by the Customers' setoff claims.

The Customers' setoff claims also contend that the Banks attempted to build up these funds for the purpose of setoff and that they knew these funds represented advances by the Customers to be used by Payroll solely for the purpose of cashing the Customers' employees' paychecks. These issues, however, are already governed within the framework of Section 553, the Bankruptcy Code's setoff provision. The right of setoff "has long occupied a favored position in our history of jurisprudence. It originated in the antiquity of Roman law and was later adopted into the English legal system." *In re Bohack Corp.,* 599 F.2d 1160, 1164 (2d Cir.1979). It "is a rule that has been embodied in every bankruptcy act the nation has had, and creditors, particularly banks, have long acted in reliance upon it." *Applied Logic,* 576 F.2d at 957–58. Therefore, although "[a]llowance or disallowance of a setoff is a decision which ultimately rests in the sound discretion of the bankruptcy court," courts must recognize that despite the fact that "the dominant impulse of [Section 553] is inequality among creditors ..., setoffs are accepted and approved because they are based upon long-recognized rights of mutual debtors." *Bohack,* 599 F.2d at 1165.

In fact, "[t]his circuit ... has repeatedly favored the allowance of setoffs." *Id.* As Judge Friendly stated in *Applied Logic,* "[t]he rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust.'" *Applied Logic,* 576 F.2d at 957; *see Cumberland Glass Mfg. Co. v. DeWitt,* 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915) ("While the operation of this privilege of setoff has the effect to pay one creditor more than another, it is a provision based upon the generally recognized right of mutual debtors which has been enacted as part of the Bankruptcy Act, and when relied upon should be enforced by the court."). Thus, a court should not disturb an otherwise valid setoff "unless compelling circumstances require it. A decision disallowing a setoff must not be made cavalierly. The statutory remedy of set off should be enforced unless the court finds after due reflection that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as a whole." *Bohack,* 599 F.2d at 1165. In addition to its favored status under the Bankruptcy Code, the Court of Appeals has recognized that "[t]he determination of set-off would seem to be intimately related to the distribution of the bankrupt's assets, the essential basis for federal concern." *Fore Improvement,* 278 F.2d at 146.

Despite its favored and central status within the Bankruptcy Code, setoff rights are not without limitations. In fact, some of these limitations are precisely those which the Cus-

tomers' setoff claims seek to impose on the Banks. Recall that the framework established by Section 553 precludes the Banks from exercising their setoff rights if they were aware that the funds in Payroll's accounts represented advances by the Customers for the specific purpose of cashing their employees' paychecks, or if the Banks accepted the deposits in question for the purpose of using these deposits to offset the debt which Payroll owed to them due to its check-kiting. *See supra* pp. 661–62. Therefore, this is not a situation where the Customers may fall back on their allegations of bad faith to distinguish their claims from those already addressed within the scheme of the Bankruptcy Code. *See, e.g., State of New Mexico v. Muzio,* 105 N.M. 352, 732 P.2d 879, 881 (App.) (holding that a state criminal statute punishing the issuance of worthless checks with the intent to defraud was not preempted by the Bankruptcy Code's prohibition against commencing criminal debt collection actions because the statute was "not a statute for debt collection but, rather, a statute created to punish an evil intent and an evil action"), *cert. denied,* 105 N.M. 358, 732 P.2d 1381 (1987).

**22.** This is not a case where the trustee has decided not to pursue the assets setoff by the Banks. *See, e.g., De Wit v. Firstar Corp.,* 879 F.Supp. 947, 995 (N.D.Iowa) (rejecting the defendant banks' argument that a claim of wrongful conversion or setoff by investors and suppliers who dealt with the bankruptcy debtors, who, in turn, used defendant banks' services, should be dismissed for failing to join the bankruptcy trustees as indispensable parties where "[n]either trustee is pursuing the assets allegedly set-off against [the debtor's] overdrafts"), *reconsidered on other grounds,* 904 F.Supp. 1476 (N.D.Iowa 1995).

**23.** Because these claims are stayed, I will not address, at this time, the Banks' other arguments in support of their motions to dismiss these claims, such as the absence of a specifically identifiable res for the Customers' conversion claims; preemption of all the Customers' claims by Regulation J; or the application of the discharge for value rule.

**24.** Because Pereira's actions are pending before me, I am able to ensure that the issue of property interests will be reached therein. Of course, if Pereira and the Banks reach a settlement prior to resolving this issue, then the Customers may also prosecute their setoff claims (assuming that they are not parties to the settlement).

In essence, the Customers' setoff claims are merely an attempt to remove the resolution of these issues from the context of Pereira's preference actions to the context of their common law actions.[22] As such, they potentially stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Sections 547(b) and 553 of the Bankruptcy Code and, therefore, may undermine the constitutional goal of having "uniform Laws on the subject of Bankruptcies throughout the United States," U.S. Const. art. I § 8, cl. 4.

Accordingly, the Customers' setoff claims are stayed pending the resolution of Pereira's preference actions.[23] The Customers may resume the prosecution of these claims only if it is determined in Pereira's actions that the property setoff by the Banks did not belong to Payroll's estate, or, more specifically, that the Customers, rather than Payroll, had proprietary interests in that property.[24] If this condition is not satisfied, then the Customers' setoff claims will be dismissed and the Customers' remedies must exist, if at all, within the confines of Payroll's Chapter 11 bankruptcy proceedings.[25]

**25.** In staying the Customers' setoff claims pending the resolution of Pereira's preference actions, I do not hold that Pereira has standing to bring these claims of conversion, conspiracy to convert, constructive trust, unjust enrichment, monies had and received, or restitution of payments by mistake on behalf of the Customers. It is well established that " '[t]he [t]rustee in bankruptcy has standing to represent only the interests of the debtor corporation. *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).' " *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir.1995) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 n. 4 (2d Cir.1985)). "Thus, the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings." *Hirsch,* 72 F.3d at 1093.

My holding herein is only that the Pereira has standing to bring his preference actions; that because he has brought these preference actions raising the same issues as those raised by the Customers' setoff claims, there exists a real and imminent potential for conflict between these actions and the Customers' setoff claims; and that to the extent of this conflict, the results dictated by the Bankruptcy Code preempt the Customers' setoff claims.

*CONCLUSION*

In 94 Civ. 1565, defendant United Jersey Bank's motion for summary judgment is DENIED and plaintiff Pereira's cross-motion for summary judgment is DENIED.

In 94 Civ. 1844, defendant National Westminster Bank's motion for summary judgment is DENIED and plaintiff Pereira's cross-motion for summary judgment is DENIED.

In 94 Civ. 8256, 95 Civ. 3685, 95 Civ. 7955, and 95 Civ. 8217, the motions to dismiss of defendants United Jersey Bank and National Westminster Bank are GRANTED as to plaintiffs' claims for negligence, aiding and abetting Payroll's wrongful conduct, breach of fiduciary duty, fraud, equitable fraud, conspiracy to conceal Payroll's check-kiting, and part of plaintiffs' conversion claims.

The motions to dismiss are DENIED as to the remainder of plaintiffs' conversion claims and plaintiffs' claims for conspiracy to convert, constructive trust, unjust enrichment, monies had and received, and restitution of payments by mistake. These claims are stayed pending the resolution of Pereira's preference actions, 94 Civ. 1565 and 94 Civ. 1844, and thereafter may be prosecuted by plaintiffs only in accordance with the terms of this Memorandum and Order.

Counsel for all parties shall advise the Court by letter, preferably a joint letter on consent, by November 1, 1996 of the steps necessary to resolve this litigation.

Counsel for all parties shall appear at a conference on November 8, 1996 at 9:00 a.m., 500 Pearl Street, Courtroom 12A, to further discuss these steps.

SO ORDERED.